## GUINNESS v. UNITED STATES.

### No. 43726.

Court of Claims.
July 7, 1947.

**120**

LITTLETON, Judge, dissenting in part.

———◆———

Thomas E. Harris, of Washington, D. C. (Ellsworth C. Alvord, Floyd F. Toomey and William H. Quealy, all of Washington, D. C., on the brief), for plaintiff.

J. W. Hussey, of Washington, D. C., and Sewall Key, Acting Asst. Atty. Gen. (Helen R. Carloss and Andrew D. Sharpe, both of Washington, D. C., on the brief), for defendant.

Before MADDEN, JONES, WHITAKER and LITTLETON, Judges.

The facts necessary to a decision of the case are set out in the opinion; they are set out more in detail in the following

### Special Findings of Fact

1. Plaintiff at all times material herein was an individual subject of Great Britain residing in France. During the calendar year 1929 and prior thereto at least from July 1, 1925 he was a partner of Ladenburg, Thalmann & Company, a partnership, hereinafter sometimes referred to as the "partnership", with its principal office at 25 Broad Street, New York City.

2. December 8, 1929, plaintiff served written notice upon the other partners of his election to terminate his relationship as a member of the partnership as of December 31, 1929. Although this notice was not in strict compliance with the partnership agreement, it was ultimately accepted by the other partners of the firm. The other partners thereupon elected to continue the business of the partnership. Plaintiff's interest in the assets of the partnership was determined pursuant to negotiation in accordance with "Clause Twelfth" of the partnership agreement which provided as follows:

Clause Twelfth: At the termination of the copartnership period, in the event that the partners owning a majority of the capital of the copartnership shall desire to continue the firm, and a new or continued firm shall be so formed, then the interest of the retiring on non-continuing partner or of the estate of any retiring or non-continuing partner, in the assets of the firm, shall be fixed and determined by exact and true statement and balance sheet of all the assets and also of all the liabilities of the copartnership.

Such statement shall be made under the supervision of the partners, including therein each retiring or non-continuing partner or partners, and the representatives of a deceased partner, and shall be signed by them respectively.

Such final statement and balance sheet shall be conclusive and shall be binding upon the partners in the new firm (or the continued firm), and the estate of any deceased partner, and upon any retiring or non-continuing partner, as the case may be, and upon all parties claiming by, through or under them respectively, and also shall operate as a final adjustment and settlement of the interest of such retiring or non-continuing partner in the assets of the firm, and neither a retiring or non-continuing partner nor the representatives of a deceased partner shall be entitled to demand any liquidation or to take any proceedings for the purpose of establishing the shares of the partners therein, except as herein provided, and no claim shall be made by the retiring partner or the executors of a deceased partner, in respect to the firm name, the use thereof, or the good-will of the business.

In the event that in the preparation of such statement an agreement shall not be reached between the retiring partner and the continuing partners with respect to the value of one or more of the assets constituting part of the partnership estate, then the partners continuing the business shall be entitled at their option to apportion such assets in kind between the new firm or the continued firm, and the retiring or non-continuing partner or partners, according to their respective interests therein. Each such asset so apportioned shall remain in the custody of the firm, which shall have the right to use that asset freely in its

business, until the proportionate share thereof apportioned to the retiring or non-continuing partner shall be delivered to such partner, his executors, administrators or assigns, in accordance with the provisions hereof, and in fixing the capital account of the several partners, the assets so apportioned shall be taken at the value respectively fixed for the same in the last preceding annual balance sheet.

The new firm, or the continued firm, as the case may be, forthwith shall place to the credit of such retiring partner, as of the date of his retirement, his share in capital account as so determined, including in said capital account the one-half of the profits for the current year provided to be carried thereto by the provisions of Clause Seventh hereof, and as between the continuing partners and the retiring partner, the retiring partner shall be treated as a creditor of the new firm or the continued firm for the amount so placed to his credit as of the date of the credit. And the continuing partners will hold the retiring partner exonerated from any further liability with respect to any of the liabilities of the firm, and such retiring partner, or non-continuing partner, his executors and administrators, shall execute all instruments requisite and necessary to vest in the new firm, or the continued firm, all the right, title and interest of the retiring or non-continuing partner in the assets of the new firm.

The amount so placed to the credit of the retiring partner shall be payable to him, his executors, administrators and assigns, in three equal installments, payable respectively in one, two and three years from the date of his retirement. The continuing partners or continued firm, as the case may be, may anticipate in whole or in part any such payment. In any such distribution the continuing partners or continued firm may deliver to a retiring or non-continuing partner, his executors, administrators or assigns, in lieu of an equivalent amount of cash, the proportionate part of any asset apportioned in kind, the value fixed as aforesaid. And on the 31st day of December in each year interest shall be allowed at the rate of five per cent per annum, and the interest for any year shall be payable on the 31st day of December of that year.

The share in the profits enjoyed by a withdrawing partner or partners shall be applied by the continued firm in the first instance to furnishing the quota of profits of the new partners, if any,

The words "retiring partner" and "non-continuing partner" as used in this paragraph respectively shall include the executors and administrators of a deceased partner who shall not become members of the continued firm. The words "continuing partner" shall include the executors and administrators of a party to these presents who may on behalf of the estate of a deceased partner become partners in the continued firm.

Following the notice of his withdrawal and until April 22, 1930, plaintiff and the continuing partners were engaged in negotiations for a settlement of plaintiff's interest in the partnership. These negotiations culminated in an agreement dated April 22, 1930, for a settlement of plaintiff's interest in the assets of the continuing partnership pursuant to "Clause Twelfth", set out above, of the partnership agreement.

3. August 6, 1931, plaintiff filed his Federal income tax return for the calendar year 1930 which disclosed ordinary net income in the amount of $4,263,853.94, a capital net loss of $17,615.77, and a tax liability of $842,160.20. That amount together with interest of $1,765.08 on the first installment was paid as follows:

August 6, 1931 .............. $212,305.13
October 3, 1931 .............. 210,540.05
December 16, 1931 ........... 210,540.05
March 16, 1932 .............. 210,540.05

There was included in that return as dividends received by plaintiff an amount of $4,746,441.57. This amount represented the correct value of plaintiff's interest in a distribution made January 7, 1930, being 21.345 per cent of such total distribution. The facts under which the transactions originated and finally culminated in the distribution appear in the findings set out below.

4. June 19, 1925, the partnership held 71,925 shares of Pittsburgh Utilities Corpo-

ration which the partnership had acquired at a cost of $959,311.75. July 1, 1925, the partnership organized the Criterion Corporation and exchanged the 71,925 shares of Pittsburgh Utilities Corporation stock for the entire capital stock of the Criterion Corporation. On the same day, the partnership also organized the Standard Utilities Corporation and exchanged all the stock of the Criterion Corporation for all the stock of the Standard Utilities Corporation.

July 8, 1925, the partnership organized the Universal Utilities Corporation and subscribed for its entire capital stock for $400,000 in cash. Likewise on July 8, 1925, the Standard Utilities Corporation transferred the entire capital stock of the Criterion Corporation to Universal Utilities Corporation for $400,000 in cash and $4,700,000 in notes of the Universal Utilities Corporation; and on the same day, the Universal Utilities Corporation liquidated the Criterion Corporation, thereby receiving the 71,925 shares of Pittsburgh Utilities Corporation stock. From July 1, 1925, and at all times herein, the partnership owned all the stock of Standard Utilities Corporation.

5. July 8, 1925, Standard Utilities Corporation bought 15,000 shares of common stock of Standard Power & Light Corporation for $15,000 cash. July 9, 1925, Universal Utilities Corporation sold the 71,925 shares of Pittsburgh Utilities Corporation stock for $2,094,087.28 in cash and 150,000 shares of common stock of Standard Power & Light Corporation of a fair market value of $3,010,000. On July 9, 1925, Universal Utilities Corporation paid its notes to Standard Utilities Corporation in the amount of $4,700,000, with $1,690,000 in cash and the 150,000 shares of Standard Power & Light Corporation stock. While the 15,000 shares of Standard Power & Light Corporation stock and the 150,000 shares of stock of the same corporation were not of the same class at the time of acquisition, the certificate of incorporation of Standard Power & Light Corporation was amended on May 4, 1926, to reclassify the stock into a single class of stock known as common stock of that corporation, share

for share, though no new certificates were issued for the stock mentioned above until January 6, 1930. For convenience all of the stock will be referred to as common stock of that corporation without regard to classification when acquired. The series of transactions through which the 165,000 shares of common stock of Standard Power & Light Corporation were acquired by Standard Utilities Corporation fixed the "basis" of that stock for determining the gain which arose from its sale on January 7, 1930, as hereinafter shown. In finding 18 are set out certain agreed facts with respect to the results which flowed from that sale.

6. On July 9, 1925, H. M. Byllesby & Company and/or Standard Gas & Electric Company owned the same number of shares of stock of the Standard Power & Light Corporation as those of the same company owned by Standard Utilities Corporation and described in the preceding finding, namely, 165,000 shares; and on that day the partnership representing the Standard Utilities Corporation, owner of the 165,000 shares (though the name of the owner was not set out in the agreement), and H. M. Byllesby & Company and/or Standard Gas & Electric Company, as owner of a like number of shares, deposited the 330,000 shares of stock in escrow with the Chemical National Bank of New York (which afterwards became the Chemical Bank & Trust Company) by an agreement prohibiting any party to the agreement from disposing of the escrowed stock except by consent of the other parties. In order to permit certain exchanges not material to the issue in this proceeding the escrow agreement of July 9, 1925, was dissolved by an agreement dated March 23, 1926, and a new agreement entered into dated April 23, 1926, by which the 330,000 shares of stock of Standard Power & Light Corporation remained in escrow under substantially the same conditions with the Chemical National Bank of New York.

7. On December 21, 1929, the partnership, H. M. Byllesby & Company, which owned, among other securities, a like number of shares of the same stock, and United States Electric Power Corporation entered

into a tripartite agreement under which, among other things, the partnership agreed to sell, and United States Electric Power Corporation agreed to buy, the 165,000 shares of common stock owned by Standard Utilities Corporation, for $10,000,000 in cash and $15,000,000 in notes of the purchaser. The agreement of sale was subject to certain conditions with respect to the adoption of amendments to the certificate of incorporation of the Standard Power & Light Corporation. The agreement provided that the sale was to take place on January 2, 1930, provided the certificate of incorporation of Standard Power & Light Corporation had been amended, as required, at least three business days prior to that date. In the event the amendments had not been made in time for a sale on January 2, 1930, then the sale was to take place not later than three days after such amendments had been made, provided that the obligations of the partnership and United States Electric Power Corporation with respect to the sale and purchase, respectively, were to terminate in the event the amendments had not been made on or before January 28, 1930, unless the time for making the amendments was extended as provided in the agreement.

As a part of the sales agreement, H. M. Byllesby & Company, as owner of substantially all the preferred stock of Standard Gas & Electric Company, which in turn controlled all of the participating preferred stock of Standard Power & Light Corporation, agreed to have Standard Gas & Electric Company formally approve the sale and amendment to the certificate of incorporation of Standard Power & Light Corporation.

At the time of the execution of the agreement of sale referred to above, the partnership did not own any of the common stock of Standard Power & Light Corporation. However, as heretofore shown, Standard Utilities Corporation owned the 165,000 shares of the stock in question, which had remained in escrow under the escrow agreement heretofore referred to, and the partnership owned all of the stock of Standard Utilities Corporation.

8.  December 31, 1929, Standard Gas & Electric Company, H. M. Byllesby & Company and the partnership delivered to the Chemical Bank & Trust Company a letter terminating the escrow agreement of April 23, 1926, in the event the sale of the 165,000 shares of common stock of Standard Power & Light Corporation was consummated pursuant to the agreement of December 21, 1929.

9.  January 6, 1930, the partnership delivered to the Chemical Bank & Trust Company 165,000 shares of common stock of Standard Power & Light Corporation with instructions reading as follows:

We hereby deliver to you, subject to the terms of this letter, certificates for One Hundred Sixty-five Thousand (165,000) shares of Common Stock of Standard Power and Light Corporation standing in the name of Richard H. Staats, duly endorsed by him in blank, with his signature guaranteed by us, and we also hand you herewith United States stock transfer stamps in the sum of Three Thousand Three Hundred Dollars ($3,300) and New York State transfer stamps in the sum of Three Thousand Three Hundred Dollars ($3,300) to accompany the same.

We make this delivery to you with irrevocable instructions that

(1)  upon the delivery to you on or before January 31, 1930, by or on our behalf of a copy, certified by the Secretary of State of Delaware, of a Certificate of Amendment to the Certificate of Incorporation of Standard Power and Light Corporation substantially in the form annexed or in any other form that may be approved in writing by Messrs. Seibert & Riggs, counsel for United States Electric Power Corporation, and

(2)  upon payment by you to us of the sum of Ten Million Dollars ($10,000,000) either for account of and against a deposit made with you by United States Electric Power Corporation or pursuant to the terms of an agreement by you to pay to us the sum of Ten Million Dollars ($10,000,000) given by you to us pursuant to instructions from United States Electric Power Corporation, you shall hold said One Hundred Sixty-five Thousand (165,000) shares of Common Stock of Standard Power and Light Corporation for account of United

States Electric Power Corporation as the owner thereof, provided, however, that simultaneously therewith you shall, for account of United States Electric Power Corporation, likewise deliver to us Four (4) certain promissory notes of United States Electric Power Corporation, dated on the date of said delivery and having attached thereto as collateral security the said certificates for One Hundred Sixty-five Thousand (165,000) shares of Common Stock of Standard Power and Light Corporation, said promissory notes to be substantially in the form of promissory note hereto annexed and to be otherwise as follows:

Note No. 1 for the sum of Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000), payable January 1, 1931, and bearing interest at the rate of five per cent (5%) per annum from its date;

Note No. 2 for the sum of Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000), payable April 1, 1931, and bearing interest at the rate of three per cent (3%) per annum from its date;

Note No. 3 for the sum of Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000), payable July 1, 1931, and bearing interest at the rate of three per cent (3%) per annum from its date; and

Note No. 4 for the sum of Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000), payable October 1, 1931, and bearing interest at the rate of three per cent (3%) per annum from its date.

The time within which the foregoing irrevocable instructions shall be carried out by you may be extended from January 31, 1930 to February 28, 1930 by written direction of the undersigned, but not otherwise.

In the event that the delivery of said certificate to or for account of United States Electric Power Corporation hereinbefore provided for, shall not have been consummated on or before February 28, 1930, or if United States Electric Power Corporation and the undersigned shall jointly in writing advise you prior to February 28, 1930 that United States Electric Power Corporation will not accept delivery of the aforesaid certificates from us or on our behalf, then and thereupon said certificates shall again be held by you subject to all the provisions of a certain escrow letter addressed to The Chemical National Bank of New York dated April 23, 1926 and signed by Standard Gas and Electric Company, H. M. Byllesby and Company and Ladenburg, Thalmann & Co.

On the same day the United States Electric Power Corporation deposited with the Chemical Bank & Trust Company $10,000,000 in cash and four promissory notes, each of a face value of $3,750,000, to the order of the partnership. The letter contained instructions for the delivery of the cash and notes to the partnership upon the consummation of the sale and such instructions were of a similar irrevocable character to that quoted above from the partnership to the Chemical Bank & Trust Company.

The above instructions were accepted by the Chemical Bank & Trust Company.

Simultaneously therewith, arrangements were made with the Chemical Bank & Trust Company to send a representative to Dover, Delaware, on the following day with the 165,000 shares of common stock of Standard Power & Light Corporation, the official check of the bank payable to the partnership in the amount of $10,000,000, and notes of the United States Electric Power Company in a total amount of $15,000,000.

10. On January 6, 1930, the Chemical Bank & Trust Company held subject to the instructions referred to above, the 165,000 shares of common stock of Standard Power & Light Corporation owned by Standard Utilities Corporation, which stock was registered in the name of one Richard H. Staats, a clerk in the office of the partnership, and endorsed in blank. As a matter of convenience, securities belonging to the partnership, to their customers, and to various corporations in which they had a controlling interest were frequently registered in the name of that individual as a "street name".

11. Pursuant to due notice the stockholders of Standard Gas & Electric Company convened in Dover, Delaware, on January 7, 1930, at 9:30 a. m., and adopted the resolutions contemplated in the agreement of December 21, 1929.

12. Pursuant to due notice the stockholders of Standard Power & Light Corpo-

ration convened in Dover, Delaware, on January 7, 1930, at 12:30 p. m., and adopted amendments to its charter of incorporation and other resolutions contemplated in the agreement of December 21, 1929.

13. Pursuant to due notice the Board of Directors of Standard Gas & Electric Company convened in Dover, Delaware, on January 7, 1930, at 1:30 p. m., and approved the prior proceedings of its stockholders and the amendments to the certificate of incorporation adopted by the stockholders of Standard Power & Light Corporation as contemplated in the agreement of December 21, 1929.

14. Pursuant to due notice the Board of Directors of Standard Utilities Corporation convened in New York City on January 7, 1930, at 1:30 p. m., and adopted the following resolution:

Resolved, that Ladenburg, Thalmann & Co., for and on behalf of Standard Utilities Corporation, and without the necessity of disclosing Standard Utilities Corporation as the principal for whom they are acting be and they hereby are authorized on behalf of Standard Utilities Corporation, to negotiate and consummate a sale of Fifteen Thousand (15,000) shares of Common Stock of Standard Power and Light Corporation at the price of One Hundred Fifty Dollars ($150) per share and to cause certificates therefor to be delivered to the purchaser thereof and, upon receipt of the purchase price therefor in cash, to hold the same to the credit of this corporation and subject to the order of its officers;

Resolved, that One Hundred Fifty Thousand (150,000) shares of Common Stock of Standard Power and Light Corporation be and they hereby are declared to be paid as a dividend upon all the outstanding shares of stock of this Corporation of each class, share and share alike, payable immediately to the holders of record thereof.

Thereupon a ticket evidencing the transfer of 150,000 shares of common stock of Standard Power & Light Corporation from Standard Utilities Corporation to Ladenburg, Thalmann & Company was delivered by Standard Utilities Corporation to Ladenburg, Thalmann & Company, that ticket reading as follows:

Jan. 7th, 1930

To Ladenburg, Thalmann & Co., 25 Broad Street, New York City by Standard Utilities Corporation. Transfer of 150,000 shs. Standard Power & Light Corporation, common.

Federal and New York State stock transfer stamps aggregating $3,300 each were duly affixed to that ticket and canceled.

At the close of that meeting, Walter T. Rosen, Chairman of the Board of Directors of Standard Utilities Corporation and a member of the partnership, informed Moritz Rosenthal, President of Standard Utilities Corporation and also a member of the partnership, who was at Dover, Delaware, of the adoption of the foregoing resolutions and the transfer of 150,000 shares of stock of Standard Power & Light Corporation to the partnership.

15. Thereafter, on January 7, 1930, the amendments to the articles of incorporation of Standard Power & Light Corporation were filed with the Secretary of State of Delaware and a certified copy thereof presented to the representative of Chemical Bank & Trust Company in Dover, Delaware. At the direction of Mr. Rosenthal, referred to in the preceding finding, the certificate for the 165,000 shares of common stock of Standard Power & Light Corporation was then transferred on its books to United States Electric Power Corporation by the transfer agent of Standard Power & Light Corporation in Dover, Delaware. All necessary stock transfer stamps were furnished at the time by the transfer agent and were duly canceled. At the direction of the president of the United States Electric Power Corporation, the representatives of the Chemical Bank & Trust Company thereupon delivered to Mr. Rosenthal the official check of the bank for $10,000,000 and four promissory notes of the United States Electric Power Corporation in the aggregate amount of $15,000,000 in payment for the 165,000 shares of common stock of Standard Power & Light Corporation, all being payable to Ladenburg, Thalmann & Company, which, with appropriate stock transfer powers executed on behalf of the United States Electric Power Corporation, were

also delivered to Mr. Rosenthal as collateral security for those notes.

16. The check of the Chemical Bank & Trust Company in the amount of $10,000,-000 was cashed by Ladenburg, Thalmann & Company and the proceeds thereof distributed as follows:

Ladenburg, Thalmann & Company ..................... $7,750,000
Standard Utilities Corporation.. 2,250,000

The notes of the United States Electric Power Corporation in the amount of $15,-000,000 were held and collected by Ladenburg, Thalmann & Company. These notes had a cash value on January 7, 1930, of $14,100,000.

17. As heretofore shown in finding 3, plaintiff filed his return for 1930 in which he reported the sum of $4,746,441.57 as dividends received. That amount represented the correct value of plaintiff's interest in the distribution of January 7, 1930, such amount being 21.345 percent thereof.

18. On January 1, 1930, the earnings and profits of Standard Utilities Corporation accumulated after February 28, 1913, amounted to $4,358,861.29 and plaintiff's ratable share thereof amounted to $930,398.-94. The gain realized by Standard Utilities Corporation from the sale on January 7, 1930, of 15,000 shares of stock of Standard Power & Light Corporation was $1,949,-400. The earnings of Standard Utilities Corporation from other sources from January 1 to 7, 1930, inclusive, were $3,102.96. If the sale of the remaining 150,000 shares of stock of Standard Power & Light Corporation on January 7, 1930 is treated as a sale by Standard Utilities Corporation, the amount by which the consideration received for such stock in that sale exceeded the cost of such stock to Standard Utilities Corporation was $19,226,753.61.

If the sale on January 7, 1930, of 150,000 shares of stock of Standard Power & Light Corporation, referred to above, was a sale by the partnership rather than by Standard Utilities Corporation, the basis for determining the gain from that sale was $771,-211.40, and plaintiff's ratable share of or interest in that basis was $164,615.29.

The stock of Standard Utilities Corporation had been continuously owned by the partnership since July 8, 1925. Plaintiff was a member of that partnership during the entire period from July 8, 1925, to December 31, 1929, inclusive, and his ratable interest in the stock of Standard Utilities Corporation, as a member of the partnership, remained the same throughout, namely 21.345 percent of the total stock outstanding.

19. From July 1925 to December 21, 1929, when the agreement for sale of Standard Power & Light stock, heretofore referred to, was executed, Ladenburg, Thalmann & Company and H. M. Byllesby & Company together owned or controlled a majority of the common stock of Standard Power & Light Corporation. H. M. Byllesby & Company through ownership of stock in Standard Gas & Electric Company controlled all the participating preferred stock (which had equal voting rights with common stock) of Standard Power & Light Corporation. During the same period Standard Power & Light Corporation owned a majority of the common stock of the Philadelphia Company, a corporation controlling a large number of public utilities in and about Pittsburgh, Pennsylvania. Both Ladenburg, Thalmann & Company and H. M. Byllesby & Company were engaged in the investment banking business and there was an understanding between them that as a result of such stock ownership or control each should participate in the placing of securities with the public for the financing of the companies owned or controlled by Standard Power & Light Corporation.

20. In the negotiations preceding the execution of the agreement of December 21, 1929, heretofore referred to, Ladenburg, Thalmann & Company was advised that the plan of reorganization contemplated in that agreement might eliminate equal participation by Ladenburg, Thalmann & Company in the future financing of the companies owned or controlled by Standard Power & Light Corporation. It was agreed that in the event of the sale of the 165,000 shares of common stock of Standard Power & Light Corporation, referred to in that

agreement, Ladenburg, Thalmann & Company should receive an option to purchase 266,666 shares of common stock of the United States Electric Power Corporation for the sum of $75,000 in consideration for the relinquishment by Ladenburg, Thalmann & Company of any right to share the future financing of the Philadelphia Company and its subsidiaries.

21. December 21, 1929, in accordance with the agreement referred to in the preceding finding, Ladenburg, Thalmann & Company received an option to purchase 266,666 shares of common stock of the United States Electric Power Corporation for the sum of $75,000. Ladenburg, Thalmann & Company simultaneously executed a memorandum agreement renouncing any right, except as shown therein, in the event of the sale of the 165,000 shares of stock of Standard Power & Light Corporation to participate with H. M. Byllesby & Company in the future financing of the Philadelphia Company and its subsidiaries. Thereafter the sale of the 165,000 shares of stock of Standard Power & Light Corporation was consummated as heretofore shown.

22. On January 30, 1930, Ladenburg, Thalmann & Company transmitted to United States Electric Power Corporation written notice of election to exercise the option referred to above on February 4, 1930. Pursuant to the exercise of that option, Ladenburg, Thalmann & Company acquired 266,666 shares of common stock of United States Electric Power Corporation upon the payment of $75,000.

23. At the time of the exercise of that option, negotiations were under way between plaintiff and the continuing partners of Ladenburg, Thalmann & Company for the settlement of plaintiff's interest in the assets of the partnership. Plaintiff claimed that he was entitled to a share in the 266,666 shares of stock of the United States Electric Power Corporation at the option price, whereas the continuing partners claimed that plaintiff had ceased to be a partner prior to the exercise of the option and had no interest in the stock acquired pursuant thereto.

24. Plaintiff's interest in the assets of the partnership was finally settled pursuant to an agreement dated April 22, 1930, under which it was agreed that plaintiff should receive his pro rata share of the stock acquired pursuant to the option, but that "Clause Twelfth" of the partnership agreement, set out in finding 2, would be applicable, and that plaintiff would receive one-third of his share in the stock December 31, 1930, one-third December 31, 1931, and one-third December 31, 1932. The partnership did not at any time during 1930 waive any of the provisions of the settlement agreement.

Plaintiff's interest in the 266,666 shares of stock acquired pursuant to the option was 55,852.67 shares. That stock had a fair market value on February 4, 1930, of $18.72 per share and a total fair market value on that date of $1,045,561.98. As shown in finding 22, the amount paid by the partnership in the exercise of the option through which the stock was acquired was $75,000. Plaintiff's share of such payment was $16,008.75. The difference between the value of plaintiff's interest in the stock on February 4, 1930, and the amount paid therefor was $1,029,553.23 ($1,045,561.98 less $16,008.75).

The fair market value of the same stock on certain other dates was as follows:

| Date | Fair Market Value Per Share |
| --- | --- |
| April 22, 1930 | $19.50 |
| December 31, 1930 | 5.50 |
| December 31, 1931 | 1.87½ |
| December 31, 1932 | .75 |

25. December 12, 1932, plaintiff filed a claim for refund of $277,163.53 for the calendar year 1930 on the ground that the distribution made by the Standard Utilities Corporation on January 7, 1930, and heretofore described in connection with the sale of 165,000 shares of stock of Standard Power & Light Corporation which plaintiff had included in his return as dividends in the amount of $4,746,441.57 (see finding 3) was taxable as ordinary income only to the extent of $44,237.16, because plaintiff's share of the accumulated earnings and profits of Standard Utilities Corporation

available for distribution on that date was not in excess of the amount named, and that the excess of the distribution represented a capital gain and as such was taxable at 12½ percent under the provisions of Section 101 of the Revenue Act of 1928, 26 U.S.C.A. Int.Rev.Acts, page 370.

June 19, 1933, the Commissioner of Internal Revenue advised plaintiff that the claim for refund would be allowed in part and disallowed in part by the issuance of a certificate of overassessment in the amount of $19,611.28. The overassessment resulted in part from the Commissioner's agreeing with plaintiff that plaintiff's share of the distribution by Standard Utilities Corporation on January 7, 1930, in excess of earnings available for distribution without considering any profit to the corporation from the sale, should be treated as capital gain. The computation as set out in that letter, showing what part of that distribution should be treated as capital gain and what part as a dividend was as follows:

150,000 shares of stock of the Standard Power and Light Corporation:

| | | |
|---|---:|---:|
| Cash | | $ 7,750,000.00 |
| Notes | $15,000.000.00 | |
| Less: 6% discount.. | 900,000.00 | 14,100,000.00 |
| Total | | $21,850,000.00 |
| Less: Surplus available for dividends | | 197,289.65 |
| Balance | | $21,652,710.35 |
| Cost of stock.. | $771,211.90 | |
| Charges against the sale .... | 81,000.00 | 852,211.90 |
| Capital net gain | | $20,800,498.45 |
| 21.345% of capital net gain | | 4,439,866.39 |
| Legal expenses attributable to capital net gain | | 71,715.22 |
| Net capital gain | | $ 4,368,151.17 |
| 21.345% of surplus available for dividends | | $ 42,111.48 |

Some of the amounts shown in that computation are not in accord with the facts as now shown in these findings, for example, "Surplus available for dividends" is shown in the computation at $197,289.65, whereas the actual earnings or profits accrued to January 7, 1930, as shown in finding 18, without considering any profit accruing to the corporation by reason of the sale on January 7, 1930, was $4,361,964.25.

Another major adjustment was the inclusion in plaintiff's income for 1930 under "commissions" of an amount of $1,122,-409.10 as plaintiff's share of the excess of the fair market value of the stock of the United States Electric Power Corporation on February 4, 1930, over the cash paid therefor in connection with the option agreement heretofore referred to. In accordance with Section 1103 of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Code, § 3772, plaintiff was duly notified of the above partial disallowance of that claim by letter dated August 3, 1933, and on or about August 7, 1933, refund checks aggregating $21,189.19 were received by plaintiff, such amount representing an overassessment of $19,611.28 and interest in the amount of $1,577.91.

26. August 14, 1933, plaintiff filed a second claim for refund of $278,823.99 in which so far as here material plaintiff made the following contention with respect to the item of "commissions" adjusted by the Commissioner in his letter of June 1933:

1—There was included in the taxable income of the taxpayer for the year 1930, $1,-122,409.10 representing the excess of the value placed by the Bureau of Internal Revenue on 56,920.905 [shares] of the stock of the United States Electric Power Corporation over the cash paid in connection with the option to receive said stock.

The taxpayer herein claims that the value of the shares of stock of the United States Electric Power Corporation at the time said option was exercised was not more than $6.426 per share and further that the amount set forth in Paragraph 1 of Page 2 of the aforesaid letter did not constitute income to the taxpayer in the year 1930.

May 11, 1935, the Commissioner advised plaintiff of the rejection of the second claim for refund, which letter included the following explanation of his action:

It has now been determined that the transfer of the 150,000 shares of stock of

the Standard Power & Light Corporation of the total of 165,000 shares owned by Standard Utilities Corporation to Ladenburg, Thalmann and Company, so that the latter concern might dispose of the stock under an arrangement previously entered into by the corporation, did not relieve the Standard Utilities Corporation from taxation on the proceeds of the sale. The profit resulting from the sale should be considered as earnings or profits subject to distribution by the Standard Utilities Corporation. Under this holding the distribution received by you is a dividend taxable in its entirety as such, since the surplus of the corporation was amply sufficient to cover the entire distribution.

A recomputation of your income tax liability for the year 1930 conceding that the item of $325,000.00 is not taxable and that expenses of $17,289.46 and $71,715.22 are allowable, discloses a deficiency in tax instead of an overassessment as indicated in the attached statement. The claim will be disallowed for the reason that your correct tax liability is in excess of the amount previously assessed. Official notice of the disallowance of the claim will be issued by registered mail in accordance with section 1103 (a) of the Revenue Act of 1932. The statute of limitations bars the assessment of any deficiency found at this time.

In accordance with Section 1103 of the Revenue Act of 1932, plaintiff was duly notified of the rejection of that claim by letter dated June 15, 1935.

27. May 11, 1937, an agreement was executed by plaintiff and the Commissioner of Internal Revenue under and in pursuance of Section 608 (b) (2) of the Revenue Act of 1928, as amended by section 503 of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev. Code, § 3774 (b) (2), suspending the running of the period of limitations on the bringing of suit by the taxpayer for the recovery of income tax for 1930 from May 11, 1937, to the date of final decisions in the cases of United States v. Rosenthal's Estate, and United States v. Rosen, pending before the United States District Court for the Southern District of New York. Those cases were still pending before the United States District Court for the Southern District of New York, and final decisions had not been entered therein at the time of filing the petition in this case.

MADDEN, Judge.

The plaintiff was a partner in the investment banking firm of Ladenburg, Thalmann and Company. In 1930 165,000 shares of the stock of Standard Power and Light Corporation, which stock was owned, directly or indirectly by the partnership, was sold to the United States Electric Power Corporation at a large profit. The question here is the extent to which the plaintiff became liable for federal income tax upon his share of this profit.

From 1925, and up to the time of the sale which produced the profit in question, the stock sold stood in the name of the Standard Utilities Corporation, which corporation was wholly owned by the partnership. As shown by our finding 7, on December 21, 1929, the partnership, purporting to represent the owner of the stock sold, but not naming the owner, made a written agreement with the United States Electric Power Corporation to sell and buy respectively the stock for $10,000,000 in cash and $15,000,000 in notes of the purchaser. According to the agreement, the transfer was to take place on January 2, 1930, if, three business days before that date, the certificate of incorporation of the Standard Power and Light Corporation had been amended in specified respects. If the amendments had not been made by that date, the transfer was to be postponed to await them, but if they had not been made by January 28, 1930, the obligations of the agreement were to terminate unless extended as provided in the agreement.

The stock to be sold had been placed in escrow some years before by an agreement described in our finding 6. On December 31, 1929, the partnership and the other party to the escrow agreement delivered a letter to the bank which held the stock in escrow. The letter terminated the escrow agreement, provided the sale agreed to on December 21, 1929, was consummated. On January 6, 1930, written instructions were

given to the bank by the partnership and the prospective purchaser with respect to the consummation of the sale. On the same day the purchaser deposited with the bank $10,000,000 in cash and four notes for $15,000,000, also payable to the partnership. Arrangements were made with the bank to send a representative to Dover, Delaware, on January 7, 1930, with the stock, a check for $10,000,000 payable to the partnership, and the purchasers' notes for $15,000,000.

On January 7, in Dover, the stockholders of Standard Power and Light met at 12:30 p. m. and amended the certificate of incorporation, as contemplated in the agreement of December 21, 1929. In New York, the Board of Directors of Standard Utilities Corporation, which owned the stock the sale of which is here involved, met at 1:30 p. m. on January 7, 1930, and adopted two resolutions, one authorizing the partnership to sell on behalf of the Corporation to United States Electric Power Corporation, 15,000 shares of stock of the Standard Power and Light Corporation. The other resolution declared a dividend of the remaining 150,000 shares of the Standard Power and Light Corporation, to be paid immediately to the stockholders of record. A ticket evidencing the transfer of the dividend stock was immediately made out and delivered to the partnership, the sole stockholder of Standard Utilities. Federal and New York State stock transfer stamps in the amount of $3,300 were affixed to the ticket.

Mr. Rosen, an officer of Standard Utilities and a member of the partnership then telephoned Mr. Rosenthal, likewise an officer and a partner, at Dover and told him what had been done. Then the amendments to the articles of incorporation of Standard Power and Light were filed with the Secretary of State of Delaware at Dover, a certified copy of them was given to the representative of the bank, the certificate for the 165,000 shares was transferred on the books of Standard Power and Light by its transfer agent at Dover, to the purchaser. The certificate for 165,000 shares included the 15,000 and the 150,000 shares covered by the two resolutions described above. Again transfer stamps were at-

tached. Then the representative of the bank delivered the check and notes to Mr. Rosenthal. The check for $10,000,000 was cashed by the partnership and the proceeds were distributed $7,750,000 to the partnership and $2,250,000 to Standard Utilities. The notes for $15,000,000 which had a then present worth of $14,100,000 were held and collected by the partnership. The plaintiff owned a 21.345 percent interest in the partnership.

The question disputed by counsel is whether or not the sale of the 150,000 shares was made by the corporation, Standard Utilities Corporation, or by the partnership of which the plaintiff was a member. If it was made by the corporation, then the corporation realized a profit of $19,226,753.61 and hence had earnings or profits of that amount to distribute as a dividend to its shareholder, the partnership, hence the partners, receiving this amount as a result of the transaction would be taxable, each in his proper proportion, upon this amount as ordinary income. On the other hand, if the corporation merely distributed the stock as a dividend in kind to its shareholder, the partnership, without itself realizing the profit involved in the sale, then the partners did not, except to the extent to which the corporation had on hand realized earnings or profits, i. e., to the extent of $4,361,964.25, receive from the corporation a dividend paid out of earnings or profits.

Section 115 (d) of the Revenue Act of 1928, 26 U.S.C.A. Int.Rev.Acts, page 385, says: "Other Distributions from Capital. If any distribution (not in partial or complete liquidation) made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not out of earnings or profits, then the amount of such distribution shall be applied against and reduce the basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property. * * *" Since all except $4,361,964.25 of the value of the distribution was "not out of earnings or profits" the shareholder could, at his option, return as a capital gain that portion of his proportionate share of the distribu-

tion which was in excess of the corporation's earnings or profits.

The concurring opinion expresses the view that whether the plaintiff received the money, in effect, from the corporation, or received the stock which he immediately sold for the same amount of money, is immaterial since in either case he would be taxable upon the same amount, as ordinary income. We discuss this divergence of views hereinafter.

■ We think that, in legal effect, the corporation sold the stock and hence, in effect, distributed the dividend to the partnership out of realized earnings. The real owners of Standard Utilities Corporation, and hence of the stock of the Standard Power and Light Corporation, which the Utilities Corporation held, were, of course, the partners, one of whom was the plaintiff. There is something unreal in disputing about whether the partners or the Utilities Corporation sold the stock, when the corporation was a creature of the partners, completely subject to their will, which had to sell when it was told to do so, and could not sell unless it was permitted to do so. But the partners had chosen this kind of a depositary in which to place their property, and if legal consequences, in the form of tax expense, attaches to this choice, they must bear this burden until Congress is persuaded to disregard, for tax purposes, the existence of the helpless juridical person. The stock, then, was admittedly owned by the corporation. The purpose was to get the ownership of the stock into the United States Electric Power Corporation, in return for some $25,000,000 which was to be divided among the partners. The simple and direct way to get the stock over to the Electric Power Corporation would have been for the Utilities Corporation, which had it, to transfer it to the Electric Power Corporation which was buying it. But, solely in order to minimize taxes, the formalities of a transfer from the Utilities Corporation to the partnership, which did not want the stock and did not intend to keep it, except momentarily and for the purpose of satisfying the order of procedure decided upon, were gone through. Then the partnership, in turn, made its prearranged move and transferred the stock to the person who was at all times intended to have it, the Electric Power Corporation.

We think that the intermediate move, useless and without any purpose except to reduce taxes, ought to be disregarded. The plaintiff says that this is holding, in effect, that parties must so shape their transactions as to produce the maximum of taxes. We think not. We do think that either of two methods of accomplishing exactly the same result ought to produce the same tax liability as the other; that the tendency in the administration of tax laws should be toward that end and that the amount of tax liability should be that which would arise out of accomplishing the intended result by the simple and direct course that would be followed if the tax liability were not in question. One should not be able to throw the tax gatherer off the scent merely by traveling to the same destination by a roundabout route.

We think we are bound to come to this conclusion by the Supreme Court's decision in Commissioner v. Court Holding Company, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981. We recognize that the opinion in that case stressed the finding by the Tax Court that the shareholders acted for the corporation in selling the property which there produced the profit which was taxed to the corporation. As we see it, that "finding" was not so much a finding of fact as the decision of the case after considering the law and the policy applicable to it. There, as here, the corporation was a puppet, and if other laws and policies had been in question, it would have been as easy there as here, and perhaps more realistic, to find that whatever was done, whether in the name of the corporation or of the shareholders, was done for the shareholders, the real owners and controllers of the corporation's acts. In the Court Holding Company case, as in ours, the shareholders caused the corporation to first distribute the property which it owned to the stockholders, which they, in turn, transferred immediately to the intended purchaser, the indirect route being traveled there, as here, for the purpose of escaping the tax on the corporation which was applicable to the corpora-

tion's profit. We think that uniformity of tax administration requires that we reach the same result in what we regard as essentially the same kind of case.

The concurring opinion presents the view that it is immaterial whether or not the corporation made the sale, since, according to Article 627 of Regulations 74 the distribution by the corporation was taxable to the recipients at its market value at the time it was distributed. The Government did not present this view in brief or argument though it would have, if valid, summarily disposed of the case. We do not, therefore, have the assistance of counsel on the point. Our finding number 25 shows that the Commissioner's administration of the law was not in accordance with this view. When he was of the opinion that Standard Utilities Corporation had first distributed the stock in question as a dividend to the partnership, which had in turn sold it, he taxed the distribution to the plaintiff, not as ordinary income but as a capital gain. Section 115 (d) of the Revenue Act of 1928, quoted supra, seems to us to cover the point, and to make it necessary for us to decide whether the corporation or the partnership made the sale. We have, as appears above, concluded that the corporation made it.

In one item of the plaintiff's claim he complains that the gains to him from the exercise by the partnership of a certain option were over-assessed. The option was to purchase 266,666 shares of stock of the United States Electric Power Corporation for $75,000, which was much less than their market value. The option was exercised on February 4, 1930, at which time the stock was worth $18.72 a share. By December 31, 1930, it was down to $5.50 per share, and went still lower thereafter. The plaintiff ceased to be a partner on December 31, 1929. He made a settlement with the continuing partners on April 22, 1930, which provided, inter alia, the extent and manner in which he was to participate in profits of the firm resulting from the completion of business which had been initiated while he was a partner. Under this agreement he was to receive his share of the option stock in three equal annual install-

ments, the first to be turned over to him on December 31, 1930. We think that, in these circumstances the value of the stock on December 31, 1930, should be taken in computing his profit, and not the value on February 4, 1930, or some other earlier time. But we cannot determine from the record whether, or how much, if anything, the plaintiff is entitled to recover. Exhibit D, attached to the plaintiff's petition, shows a contention by the Bureau of Internal Revenue, when it passed upon the plaintiff's claim for refund, that the plaintiff had been under-assessed on his whole income for 1930, that further assessment was barred by the Statute of Limitations, and that for that reason he would not be entitled to recover upon his claim for refund even if it were otherwise meritorious, since he had not over-paid his 1930 taxes. We cannot, from the record, determine whether the position of the Bureau was correct, nor what amount of refund the plaintiff would be entitled to if the Bureau's position was not correct. We must, therefore, remand this branch of the case to a Commissioner for an accounting. The accounting and the arguments to us on the return of the case should cover the question of whether the value on December 31, 1930, of the whole of the plaintiff's share of the option stock, or only the value of the one-third of that share, which third was to be delivered on that date, should be considered in determining the plaintiff's 1930 income.

The case will be remanded to a Commissioner of this court for further proceedings in accordance with this opinion and report to the court.

It is so ordered.

JONES, Judge, concurs.

WHITAKER, Judge (concurring).

I concur in the result reached, but I cannot concur in the reason given therefor. I do not agree that a taxpayer may not avail himself of any legal method of handling a transaction that will reduce the amount of taxes to be paid on account of it. The Supreme Court has so held more than once. In Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596,

97 A.L.R. 1355, the Supreme Court said: "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted."

The court cites as authority for this statement United States v. Isham, 17 Wall. 496, 506, 21 L.Ed. 728; Superior Oil Co. v. Mississippi, 280 U.S. 390, 395, 396, 50 S. Ct. 169, 74 L.Ed. 504; and Jones v. Helvering, 63 App.D.C. 204, 71 F.2d 214, 217.

In the Isham case the Supreme Court said:

"* * * To this objection there are two answers:

"1st. That if the device is carried out by the means of legal forms, it is subject to no legal censure. To illustrate. The Stamp Act of 1862 imposed a duty of two cents upon a bank check, when drawn for an amount not less than twenty dollars. A careful individual, having the amount of twenty dollars to pay, pays the same by handing to his creditor two checks of ten dollars each. He thus draws checks in payment of his debt to the amount of twenty dollars, and yet pays no stamp duty. This practice and this system he pursues habitually and persistently. While his operations deprive the government of the duties it might reasonably expect to receive, it is not perceived that the practice is open to the charge of fraud. He resorts to devices to avoid the payment of duties, but they are not illegal. He has the legal right to split up his evidences of payment, and thus to avoid the tax. The device we are considering is of the same nature."

Ladenburg, Thalmann & Company had the legal right to organize the Standard Utilities Corporation for the sole purpose of holding its stock in the Standard Power & Light Corporation, and then, when this partnership wanted to dispose of the stock, it had the legal right to cause this holding company to transfer the stock to it as a dividend in kind, and then the partnership had the right to sell it.

The partnership was not required to cause the corporation to make the sale because, perchance, this method of handling the transaction might result in more taxes to the Government. See Howell Turpentine Co. v. Commissioner, 5 Cir., 162 F.2d 319.

In its negotiations with the United States Electric Power Corporation for a sale to it of the stock of the Standard Light & Power Company, the partnership did not represent that it was acting for the Standard Utilities Corporation, in whose name the Standard Light & Power Corporation stock was held; the partnership was acting for itself, insofar as the United States Electric Power Corporation knew, at least. This was not the case in Commissioner v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 708, 89 L.Ed. 981, upon which the majority rely. There the corporation initiated the negotiations for the sale, and then, realizing that a sale by it would result in more taxes than if it declared a liquidating dividend, and if the stockholders receiving the dividend carried out the sale, it decided that the latter method would be adopted.

In that case the Supreme Court did not hold that this method could not have been adopted in the beginning, and that the tax liability would not have been determined accordingly. It based its decision expressly on the finding of the Tax Court that "despite the declaration of a 'liquidating dividend' followed by the transfers of legal title, *the corporation had not abandoned the sales negotiations;* that these were mere formalities *designed 'to make the transaction appear to be other than what it was'* in order to avoid tax liability." (Italics ours.) It called attention to the fact that the Circuit Court of Appeals had held that "the corporation had 'called off' the sale," but held that "there was evidence to support the findings of the Tax Court, and its findings must therefore be accepted by the courts," citing cases. It said: "On the basis of these findings, the Tax Court was justified in attributing the gain from the sale to respondent corporation."

We have not these facts in the case before us, and I do not think, therefore, the Court Holding case, supra, is controlling. Howell Turpentine Co. v. Commissioner, supra.

However, insofar as the tax payable by the partners is concerned—the sole question presented—I do not think it makes any

difference who made the sale, whether the corporation or the partnership.

If the corporation made it, the partners are taxable on the cash they received as if the corporation had declared an ordinary cash dividend out of earnings and profits. The parties agree on this.

On the other hand, if the corporation distributed the stock as a dividend, the partners are taxable on the market value of the stock so received, if the distribution of the stock can be said to have been out of earnings or profits. Article 627 of Regulations 74 says:

"Dividends paid in securities or other property (other than its own stock) in which the earnings of a corporation have been invested, are income to the recipients to the amount of the market value of such property when receivable by the shareholders. * * * Where a corporation declares a dividend payable in stock of another corporation, setting aside the stock to be so distributed and notifying the shareholders of its action, the income arising to the recipients of such stock is its market value at the time the dividend becomes payable. * * *"

The validity of this regulation has not been questioned. See Commissioner v. Wakefield, 6 Cir., 139 F.2d 280; Commissioner v. F. J. Young Corp., 3 Cir., 103 F.2d 137.

The market value of the stock is established, *prima facie* at least, by the price for which it was sold immediately after the dividend was paid. This is the amount the plaintiff included in his return as a dividend.

Whatever is the correct view of the transaction, therefore, the resulting tax liability of the partners is the same, *provided* the distribution of the stock was out of earnings and profits.

That this distribution was out of earnings and profits, I have no doubt. It is stipulated that on January 7, 1930, the date of the dividend, the earnings of the Standard Utilities Corporation were $4,361,963.25. The cost to the Standard Utilities Corporation of the 150,000 shares of stock declared as a dividend was not more than $3,010,000. This is so because this stock was acquired through an exchange of the notes of the Universal Utilities Corporation of $4,700,000, held by the Standard Utilities Corporation, for $1,690,000, in cash and 150,000 shares of this stock. The stock, therefore, could not have cost the Standard Utilities Corporation more than $3,010,000. It is agreed that it had a fair market value when acquired by the Standard Utilities Corporation of $3,010,000.

If the corporation did not sell this stock, it must be carried on its books at its cost in determining earnings and profits of the Standard Utilities Corporation. Appreciation or depreciation in value is an unrealized gain or loss and, hence, cannot be taken into account. See Article 71 of Regulations 74. Gould et al. v. Commissioner, 21 B.T.A. 824; United States v. White Dental Mfg. Co., 274 U.S. 398, 401, 47 S.Ct. 598, 71 L.Ed. 1120. In arriving at the earnings of $4,361,963.25 the stock was in fact carried at $3,010,000. When it was distributed as a dividend, this asset was merely stricken from its balance sheet, reducing earnings to $1,351,963.25.

It results that after the distribution of the stock and the reduction of earnings by the cost of it, $3,010,000, there was still left profits of $1,351,963.25. It follows that the distribution could not have been out of capital because there were sufficient earnings out of which it could have been made.

If, on the other hand, we treat the sale as having been made by the corporation, then the corporation realized the appreciation in value of the stock, being the difference in the cost of the stock to it of $3,010,000 and the sale price of $21,850,000, the figure the parties agree on, a gain of $18,840,000. This would have increased the corporation's earnings from $4,361,963.25 to $23,201,963.25. Then after the corporation had distributed the amount received of $21,850,000, it would have left earnings of $1,351,963.25.

So it is that in neither case can the distribution be said to have been out of capital, since in both cases the earnings were sufficient to take care of it.

It results that the taxpayer correctly returned the amount received for the stock as a dividend.

We have not before us the tax liability of the corporation and I do not think it is necessary to decide what it was.

LITTLETON, Judge (dissenting in part).

I concur in the opinion of Judge MADDEN, except to the extent that it is held "that the intermediate move, unless and without any purpose except to reduce taxes, ought to be disregarded," and the conclusion therefrom on authority of the case of Commissioner v. Court Holding Company, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981, that plaintiff and other partners of Ladenburg, Thalman and Company were not entitled in their income tax returns to treat the distribution by the Standard Utilities Corporation of the 150,000 shares of stock of the Standard Power and Light Corporation, as a dividend in kind and compute their tax with respect to such dividend at the capital gain rate of 12½ percent to the extent that the fair market value of said 150,000 shares at the time of the distribution exceeded the sum of $4,361,964.25 representing the earnings and profits of the corporation available for distribution as a dividend.

I think, as pointed out by Judge Whitaker in his concurring opinion, that the distribution by the corporation of the 150,000 shares of stock as a dividend was in all respects a legal and valid distribution, and that the sale of such stock was made by the partnership for its own account and not for and on behalf of the Standard Utilities Corporation; and on the facts of this case it is clearly distinguishable from the ultimate finding by the Tax Court in the Court Holding Company case, supra, and the decisions of the Tax Court and of the Supreme Court on such finding. In the case of Commissioner v. Court Holding Company, supra, the facts which formed the basis of the decisions therein disclosed that, between October 1, 1937 and February 1940, while the corporation still had legal title to the property, which it attempted later to distribute to its stockholders as a liquidating dividend, negotiations for the sale by the corporation of this property took place, and these negotiations were between the corporation and the lessees of the property. As a result of these negotiations an oral agreement was reached as to the terms and conditions of sale by the corporation to said lessees, and on February 22, 1940, the parties met to reduce the agreement to writing. The purchaser was thereupon advised by the corporation's attorney that, for tax reasons, the sale could not be consummated, and on the next day the corporation declared a liquidating dividend, which passed the property involved to its two stockholders, who then made the sale to the same person or persons who had agreed to purchase the property from the corporation, substantially the same as had been previously agreed upon by the corporation and such person. We do have such facts in this case.

I am, therefore, of the opinion that the first decision of the Commissioner of Internal Revenue in plaintiff's case on June 19, 1933, in which he treated the value of the 150,000 shares of stock of the Standard Power and Light Company as a dividend taxable to the partners as a net capital gain, to the extent that the fair market value of such stock at the time of distribution exceeded $4,361,962.25, representing the earnings and profits of the corporation available for distribution as a dividend.

The plaintiff argues, and I agree with his argument that the case before this Court does not involve the creation of an artificial or temporary device to escape taxation. In fact, the parties did not even foresee the result for which plaintiff now contends. The corporation declared a valid dividend in kind. Both the corporation and its shareholders continued in business. Not being aware that the dividend was taxable, as such, only to the extent of the earnings and profits available for distribution, the shareholders reported the full value thereof as ordinary income. There is no basis for failing to give full effect to what was done. (Chisholm v. Commissioner, 2 Cir., 79 F.2d 14, 101 A.L.R. 200.) To the extent that the dividend exceeded the accumulated earnings and profits, plus the shareholders' bases for the stock, the distribution is admittedly taxable as a capital gain.

The sale of the stock involved in this case was negotiated and contracted for by the

partnership. The purchaser did not know of the existence of any other owner. Having negotiated the sale, the partnership then, as it had a perfect right to do, had the corporation declare the dividend. The partnership paid a tax for the right of thus taking down the stock. If the sale had been halted, as was threatened by a minority group at the last minute, the choice would have resulted in a substantial detriment to the partnership. Having elected to follow this course, the partnership is entitled to be taxed accordingly.

WHALEY, Chief Justice, took no part in the decision of this case.