CUMBERLAND PUBLIC SERVICE CO. v.
UNITED STATES.

No. 46963.

United States Court of Claims.

May 2, 1949.

Cornelius W. Grafton, of Louisville, Ky. (Henry H. Mathis, and Wyatt, Grafton & Grafton, all of Louisville, Ky., on the brief), for plaintiff.

J. H. Sheppard, of Washington, D. C., and Theron Lamar Caudle, Asst. Atty. Gen. (Robert N. Anderson and Andrew D. Sharpe, both of Washington, D. C., on the brief), for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

WHITAKER, Judge.

W. L. McComas and E. S. Mayes and their families owned all of the stock of the Cumberland Public Service Company, an electric light company, located in Kentucky. On June 10, 1940, McComas and Mayes entered into an agreement with the Tri-County Electric Membership Corporation to sell to it certain of the physical properties of the plaintiff company, the Cumberland Public Service Company, as soon as this company was liquidated and the properties were received by them as a liquidating dividend. The sale was later consummated.

Subsequently the plaintiff company filed its income tax return for 1940 reporting a loss on the year's operation and no tax liability. It disclosed the sale of some of its properties to the Tri-County Electric Membership Corporation, but stated that this sale had been made by the stockholders, and not by the corporation. On an audit of this return the Commissioner of Internal Revenue determined that the property had been sold by the corporation, at a profit, and a tax on this profit was assessed against the corporation.

The return of the plaintiff company also claimed a loss on the sale of certain real estate of the company to one of the

stockholders and a loss on the sale of machinery and equipment to another stockholder. These claimed losses were disallowed by the Commissioner. A total deficiency in tax and interest of $19,698.18 was assessed against the company. This deficiency was paid and a claim for refund was duly filed. Upon its disallowance this suit was brought.

The first issue presented is whether or not the assets sold to Tri-County Electric Membership Corporation were sold by the corporation or whether the sale was made by the stockholders.

It is clear from the testimony that from the beginning of negotiations for the purchase of the plaintiff company's assets the stockholders of the plaintiff were desirous of selling their stock in the plaintiff company, instead of causing the plaintiff company to sell the physical properties desired by Tri-County Electric Membership Corporation (referred to hereafter as Tri-County). Tri-County, however, did not desire all of the assets of the plaintiff company, and the stockholders thereupon agreed to reduce the price asked for their stock from $156,000 to $115,000, with the understanding that plaintiff company in the meantime should dispose of the assets which Tri-County did not want.

The original conference between representatives of Tri-County and the stockholders of the plaintiff company was at Murfreesboro, Tennessee, on February 16, 1940. There was present at this meeting a representative of the Rural Electrification Administration, hereinafter referred to as REA, which Administration was considering advancing to Tri-County the money for the purchase of these properties. This representative expressed doubt as to whether or not the REA could lawfully advance money to Tri-County for the purchase of the stock of the plaintiff corporation, but no final determination of this question was had until May 15, 1940, at a conference in Washington between the representatives of the REA and an attorney who represented both the stockholders of the plaintiff company and the plaintiff company itself. At this meeting this attorney was definitely advised that the REA could not advance money for the purchase of the stock of the plaintiff company.

The REA then advised this attorney that it was willing to advance to Tri-County the sum of $104,000 for the purchase of the physical properties desired. This attorney communicated this offer to the stockholders of the plaintiff company, who then directed the attorney to write the REA in part as follows: "Upon my return from Washington I reported our conversation to Messrs. McComas and Mayes, who felt that prior to making a commitment they should seek to ascertain what the taxes would run. We immediately employed a certified public accountant who is at Burkesville today getting certain information from the books and we are exploring two or three methods of handling the matter with possible taxes involved in each method. It will probably be the end of the week before we are able to say with any degree of assurance what the taxes will be, and until that time I am afraid my clients will be unable to make up their minds."

This accountant made computations of what the taxes would be if the corporation should sell the physical properties to Tri-County; what they would be if the stockholders sold their stock; and what they would be if the corporation dissolved and distributed its assets to the stockholders and then the stockholders made the sale of the desired properties to Tri-County. After these computations had been made it was determined that the least tax liability would be incurred by dissolving the corporation, distributing the assets to the stockholders, and letting the stockholders make the sale of the desired properties.

Thereupon, the stockholders of the plaintiff company determined to accept the offer and entered into a contract with Tri-County, agreeing to transfer to it certain properties upon receipt of them through liquidation of the plaintiff company. Later, the company was liquidated, its assets were distributed to its stockholders, and the stockholders made the sale to Tri-County of the properties desired.

It is evident that the transaction was handled in the way it was handled for the

purpose of incurring the least tax liability. The purpose of the stockholders in the beginning, in undertaking to sell their stock in the plaintiff company rather than to cause this company to sell the physical assets, was to reduce tax liability as much as possible, and this purpose continued throughout the negotiations and determined the way the transaction was finally handled. There was never at any time an intention on the part of the plaintiff company or of its stockholders to cause this company to make the sale of its physical properties, because it was thought from the beginning that this would result in the greatest tax liability.

Under such facts we do not think it is tenable to say that, although the sale in form was made by the stockholders, it was in fact made by the corporation.

Although the avowed purpose of the stockholders of the plaintiff company was to reduce taxes, nevertheless, every step they took in the matter was entirely legal; there is not a suspicion of fraud or evasion involved; it was an open and above-board effort to carry out the transaction in the way that would result in the least taxes. This they had the undoubted right to do.

In Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596, 97 A.L.R. 1355, the Supreme Court said: "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted."

The court cited as authority for this statement United States v. Isham, 17 Wall. 496, 506, 21 L.Ed. 728; Superior Oil Co. v. State of Mississippi, 280 U.S. 390, 395-396, 50 S.Ct. 169, 74 L.Ed. 504; and Jones v. Helvering, 63 App.D.C. 204; 71 F.2d 214, 217. In the Isham case the Supreme Court said:

"* * * To this objection there are two answers:

"1st. That if the device is carried out by the means of legal forms, it is subject to no legal censure. To illustrate. The Stamp Act of 1862 imposed a duty of two cents upon a bank check, when drawn for an amount not less than twenty dollars. A careful individual, having the amount of twenty dollars to pay, pays the same by handing to his creditor two checks of ten dollars each. He thus draws checks in payment of his debt to the amount of twenty dollars, and yet pays no stamp duty. This practice and this system he pursues habitually and persistently. While his operations deprive the government of the duties it might reasonably expect to receive, it is not perceived that the practice is open to the charge of fraud. He resorts to devices to avoid the payment of duties, but they are not illegal. He has the legal right to split up his evidences of payment, and thus to avoid the tax. The device we are considering is of the same nature."

The Government contends that this well established and sensible doctrine has been overturned by the Supreme Court in Commissioner v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981. We cannot impute to the Supreme Court an intention to so hold. In the Court Holding Company case the corporation had initiated the negotiations for the sale, but when it was realized that this would result in more taxes than from a sale by the stockholders, after a liquidating dividend, the sale by the corporation was ostensibly dropped (as found by the Tax Court) and the sale was nominally made by the stockholders. The Court held that the corporation had actually made the sale. But the Court did not hold that the stockholders could not have initiated negotiations for the sale in the first instance, and could not have carried it through themselves without resulting liability on the corporation for any profit derived from the sale. The Court was of opinion that the corporation, having initiated the sale, in effect consummated it. Its decision was based expressly on the finding of the Tax Court 2 T.C. 531 that "despite the declaration of a 'liquidating dividend' followed by the transfers of legal title, *the corporation had not abandoned the sales negotiations;* that these were mere formalities *designed 'to make the transaction appear to be other than what it was'* in order to avoid tax liability." [Italics ours.] It called attention to the

fact that the Circuit Court of Appeals, 5 Cir., 143 F.2d 823 had held, instead, that "the corporation had 'called off' the sale," but held that "there was evidence to support the findings of the Tax Court, and its findings must therefore be accepted by the courts." [324 U.S. 331, 65 S.Ct. 708] It said: "On the basis of these findings, the Tax Court was justified in attributing the gain from the sale to respondent corporation."

These are not the facts here. From the very beginning it was the stockholders who were negotiating for the sale of their stock. There was never any intention that the corporation should make the sale, and even when the REA determined that they could not furnish the money to Tri-County to buy the stock, the stockholders still persisted in their purpose of making the sale themselves, and for this reason they caused a dissolution of the plaintiff company, and the stockholders then in fact made the sale of the physical properties received by them as a liquidating dividend.

We are of the opinion that the principle first laid down by the Supreme Court in the Isham case, 17 Wall. 496, 21 L.Ed. 728, and reiterated in Superior Oil Co. v. State of Mississippi, 280 U.S. 390, 50 S.Ct. 169, 74 L.Ed. 504, and in Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L. Ed. 596, 97 A.L.R. 1355, is still the law. If this principle be applied to the facts of this case, we think it is altogether untenable to say that, although the sale in this case was ostensibly made by the stockholders, it was in fact made by the corporation.

The view we have taken is the same as that taken by the 5th Circuit Court of Appeals in the case of Howell Turpentine Co. v. Commissioner, 162 F.2d 319, in which opinions were written by Judge Sibley, and by Judges Hutcheson and Lee, all of whom expressed the opinion that although the avowed purpose is to reduce taxation, nevertheless the stockholders of a corporation may validly contract to dissolve the corporation and to sell the physical assets themselves. See also Commissioner v. Falcon Co., 5 Cir., 127 F.2d 277; United States v. Cummins Distilleries Corp., 6 Cir., 166 F.2d 17; Acampo Winery & Distilleries, Inc. v. Commissioner, 7 T.C. 629.

It is unnecessary for us to determine whether or not the plaintiff is entitled to the loss they claim upon the sale to McComas and Mayes of its remaining machinery and its real estate, since, if the sale of its transmission lines to Tri-County was not made by the corporation, it had no taxable income. Since we are of the opinion that it was not made by the plaintiff company, but by the stockholders, we do not consider whether or not the company is entitled to the deduction claimed for these losses.

Judgment will be entered for the plaintiff in the sum of $19,698.18, plus interest, according to law, on $17,054.70 from October 15, 1943, and interest on $2,643.48 from December 16, 1943.

JONES, Chief Judge, and HOWELL and LITTLETON, Judges, concur.

MADDEN, Judge (dissenting).

I am unable to agree with the court's decision. The object of the parties here, as in the case of Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981, was to transfer certain tangible property from the plaintiff corporation, its owner, to the Tri-County Electric Membership Corporation. In the Court Holding Company case, the tax consequences of a direct sale were not at first known to the selling corporation, hence it proceeded, up to a point, with the negotiation, but, upon learning that taxes would be reduced by first dissolving the corporation and distributing the assets to the stockholders, who, in turn, would transfer them to the intended purchaser, it followed that course. The court held that the fact that the transfer was made by two steps instead of one, did not, in the circumstances, reduce the tax liability. The instant case involves the same two steps, taken for the same reason. The factual difference that here the plaintiff corporation knew from the outset what the tax consequences of a direct sale would be, instead of, as in Court Holding, learning them later, cannot be important. The corporation had not, in that case, proceeded to the

point of making a binding agreement of sale before it discovered the tax problem and changed the form of the transaction. Hence it could be said in that case, as well as in our case, that perhaps the corporation, or the stockholders who controlled it, would not have been willing to sell at all, unless they could keep the taxes which would result from the sale down to the level at which the form of the transaction was directed.

My views as to how this and similar questions of taxation should be treated are expressed in the case of Benjamin Guinness v. United States, 73 F.Supp. 119, 109 Ct.Cl. 84, 106, certiorari denied, 334 U.S. 819, 68 S.Ct. 1083, 92 L.Ed. 1749.

I do not discuss the plaintiff's claim for losses upon the sale of its remaining machinery and real estate, in view of the court's decision that there were no profits against which these losses could be set off.