The STANDARD OIL COMPANY, an Ohio Corporation,

v.

The UNITED STATES.

No. 49152.

United States Court of Claims.
May 3, 1955.

H. Vincent E. Mitchell, Cleveland, Ohio, for plaintiff. M. E. Newcomer and McAfee, Grossman, Taplin, Hanning, Newcomer & Hazlett, Cleveland, Ohio, were on the brief.

H. Brian Holland, Asst. Atty. Gen., for the defendant. Andrew D. Sharpe, Ellis N. Slack and J. W. Hussey, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

On July 1, 1940, the Federal Manufacturers' Sales Tax on gasoline was, by a statute enacted before that date, to be increased from its former rate of one cent to the rate of one and one-half cents a gallon. In anticipation of that increase, the plaintiff, the manufacturer of the gasoline in question, on June 27, purported to lease to the Fleet-Wing Corporation, hereinafter called Fleet-Wing, which had for some years been buying large quantities of gasoline from the plaintiff, storage tanks located on the land of the plaintiff's refineries at Canton, Cleveland, Toledo, Lima and Cincinnati, Ohio. The purpose of leasing the tanks was to enable the plaintiff to transfer possession of gasoline to Fleet-Wing by placing it in the tanks. On June 28 the plaintiff entered into an agreement of purported sale to Fleet-Wing of 6,300,000 gallons of gasoline. Orders for delivery of the gasoline into the leased tanks were given on June 27, 28, 29 and 30, and the gasoline was, in fact, delivered by the plaintiff into the leased tanks on or before June 30. The tanks were locked, when filled, and the keys to the locks were turned over to Fleet-Wing, also on or before June 30.

From the foregoing, it would seem that the plaintiff, the manufacturer, had sold the gasoline before July 1, and that the tax rate applicable to the sale was one cent per gallon. The Commissioner of Internal Revenue, however, concluded that the purported sale was not a sale, because Fleet-Wing Corporation was a wholly owned subsidiary of the plaintiff. He concluded that no true sale took place until later when Fleet-Wing, as the *alter ego* of the plaintiff, in due course sold the gasoline to others. That took place after July 1, when the one and one-half cent tax rate was in effect. The Manufacturers' Excise Tax becomes due when the manufacturer sells the product. The Commissioner imposed the higher rate and the plaintiff paid it. The difference, with interest accrued up to the date of its collection on August 12, 1942, was $35,015.92. The plaintiff sues for the recovery of that amount, with statutory interest.

Except for the fact that Fleet-Wing was the wholly owned subsidiary of the plaintiff, the conduct of the parties would seem quite natural. When a sales tax is to be imposed or to be increased, individuals and business enterprises buy as many of the goods as they have room for and will need, in order to avoid paying the tax. The Government points to the meticulous care and formality with which the instant transaction was carried out; the formal lease, the agreement of sale, the orders for delivery, the livery of seisin of the keys. It says, in effect, "Methinks the lady doth protest too much". We are, of course, not competent in that field. But we see in the formalities no particular evidence of a *mens rea* in these inanimate juristic entities, except by way of premonition of the suspicious eye which the tax-gathers have, as it has turned out, cast upon the transaction.

The law permits the fictitious situation of a legal entity which is wholly owned by and is therefore wholly subject to the control of, another legal entity or an individual. In proper cases, the law, having permitted the creation of this fiction, makes believe that it does not.

exist. The law "pierces the corporate veil" and gets to the substance of the transaction. In the instant situation, if we try to imagine how the parties would have acted if Fleet-Wing had not been owned by the plaintiff, it would seem that they might well have acted the same way. The plaintiff would still have wanted Fleet-Wing to sell as much of the plaintiff's gasoline as possible. It would have wanted to put this good customer in a position of competitive advantage over sellers of rival gasolines. If it had storage tanks available, as it apparently did have, it would have been quite normal for it to do what it did here.

As to the Government's contention that, for tax purposes, Fleet-Wing was identical with the plaintiff, and the purported sale from the plaintiff to Fleet-Wing was a nullity, we doubt whether the Government would really stand by that proposition. If, before Fleet-Wing removed the gasoline from the leased tanks and sold it to others, lightning had struck a tank and destroyed the gasoline, no tax at all would have been payable by anyone, according to the Government's contention in this case, because the manufacturer would never have sold the gasoline.

The Government cites, among other cases, our decisions in The Ayer Company v. United States, 38 F.Supp. 284; 93 Ct.Cl. 386; Black, Starr & Frost-Gorham, Inc., v. United States, 39 F.Supp. 109, 94 Ct.Cl. 87; and Kin-Septic Co. v. United States, 64 F.Supp. 142, 105 Ct.Cl. 594. In these cases the subsidiary corporations were formed for the purpose of avoiding excise taxes. They operated at the same place with the same employees doing the same things which they had done before the tax questions arose. They were obvious shams. In the instant case, Fleet-Wing had been formed, and its stock had been later acquired by the plaintiff for reasons and purposes wholly unrelated to any tax question; it had its own office and its own sales accounting office and administrative staff; it conducted its own advertising and determined its own business policies, it sold its gasoline to its own customers and made no use of the plaintiff's sales organization. It sold its gasoline under its own trade name and its gasoline competed with that of the plaintiff in the market in the same area.

The Government cites Continental Oil Co. v. Jones, 10 Cir., 113 F.2d 557. There the parent company purported to sell large quantities of gasoline and oil to wholly owned subsidiaries in anticipation of an increase in the Manufacturers' Excise Tax. It purported to sell 33 million gallons of gasoline and 5 million gallons of oil to a subsidiary which had never been in the business of buying or selling gasoline or oil and had no facilities for so doing, had no money, and was nothing but "a small dummy or holding company organized to protect" the parent company's name in states where the parent company was not authorized to do business. The gasoline and oil were ultimately sold by the parent company in the usual way and the money never passed, even formally, through the hands of the subsidiary company.

The Government urges that the plaintiff cannot recover because, in general, Fleet-Wing raised the price of gasoline to its customers by one-half cent on July 1, 1940, and thus passed on the tax to them. But the tax was imposed on the plaintiff and paid by it and not passed on by it to Fleet-Wing. Only by concluding that the sale to Fleet-Wing was a nullity, which we do not do, would the price which Fleet-Wing charged its customers be relevant on the question of passing on the tax.

We think that what occurred in the case before us was tax avoidance, and not tax evasion. The fact that there was no reason for the parties doing what they did, when they did it, except to escape taxes, does not make the transaction vulnerable. United States v. Cumberland Public Service Co., 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251, affirming, 83 F.Supp. 843, 113 Ct.Cl. 460.

The plaintiff may have a judgment for $35,015.92, with interest according to law.

It is so ordered.

LARAMORE, WHITAKER, and LITTLETON, Judges, concur.

JONES, Chief Judge (dissenting).

I think that the Standard Oil Company was liable for the tax. The law imposes a tax on "gasoline sold by the producer." I would find that Fleet-Wing acted merely as selling agent of the producer and not in its own independent capacity.

Some of the facts are not made clear in the findings and I think the findings should be modified so as to state them in more definite form. From the evidence and the record as a whole it is clear that Fleet-Wing was merely a controlled appendage of Standard Oil. Most of Fleet-Wing's orders were filled by Standard products. Its pricing policies were determined by a market in which Standard Oil's retail brands were the price leaders. Its officers and directors, with the exception of two, served in such capacities with Standard Oil. In my judgment the record does not fully sustain a finding that Fleet-Wing "determined its own business policies," though as a practical matter it was undoubtedly permitted to determine minor details.

Fleet-Wing's operations consisted of paper manipulations mainly. Normally its orders for gasoline were forwarded to Standard for delivery to Fleet-Wing's customers; Standard handled the deliveries and Fleet-Wing kept no inventories. It does not appear that Fleet-Wing in any way altered the gas it bought; it simply sold gas, specially colored for it by the plaintiff.

The transaction in question was very unusual. Previously there had been very few large-quantity transactions between Fleet-Wing and Standard. The findings do not cite any other transaction where Fleet-Wing itself took delivery. Such delivery as was made in this instance was in Standard's own tanks which were leased to Fleet-Wing for six months and delivery of Fleet-Wing's own gasoline was then handled by Standard as usual. Standard turned out to be a very lenient landlord. As soon as a tank was emptied by Fleet-Wing, Standard cancelled the lease. Ordinarily it would be immaterial whether the parent or its wholly owned selling subsidiary paid the excise—it ultimately all shows up on Standard's profit account. But when it became profitable to make Fleet-Wing appear independent, special legal trappings were donned for the occasion.

Had Fleet-Wing not been a wholly owned and controlled subsidiary, the transaction might well have been different. By stocking up on inventory an independent entity takes on additional risks or costs. It must temper its inventory policies accordingly. Here the subsidiary took only risks and costs that would have been incurred by the parent company in any event. Whether these costs would find their way into Standard's income statement directly or indirectly was in itself immaterial. The parent, therefore, had no good business reason for not instructing its subsidiary to take title to the gasoline.

I fully concede the right of a taxpayer to choose the method of doing business that will make his taxes less than another method. Sometimes the line of distinction is very thin between a real and a make-believe change of policy. But to permit a temporary change of this character made for the sole purpose of avoiding a tax would encourage large concerns to maintain subsidiaries purely for such purposes.

Fleet-Wing increased its price the amount of the additional tax which became effective July 1, 1940, and thus passed it on to its customers or to the ultimate purchasers. In doing so it was acting as the selling agent of Standard. Plaintiff is therefore not entitled to recover because it has not met the requirements of section 3443(d) of the Internal Revenue Code of 1939.

I would dismiss plaintiff's petition.