HOWELL TURPENTINE CO. v. COM-
MISSIONER OF INTERNAL
REVENUE.

No. 11845.

Circuit Court of Appeals, Fifth Circuit.

June 4, 1947.

Robt. R. Milam, of Jacksonville, Fla., for petitioner.

Newton K. Fox and Lee A. Jackson, Sp. Assts. to Atty. Gen., Sewall Key, Acting Asst. Atty. Gen., and J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue, and C. R. Marshall, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before SIBLEY, HUTCHESON, and LEE, Circuit Judges.

SIBLEY, Circuit Judge.

The question for decision is whether the Tax Court's holding that a sale in 1940 of 53,488 acres of land in Baker and Union Counties. Florida. to National Turpentine and Pulpwood Corporation was made by Howell Turpentine Company and resulted in realizing a taxable gain to it, is according to law. The case is reported 6 T. C. 364. On this question the court divided, the majority opinion arguing for several legal theories, mistaking as we think some principles of law, and culminating in a disregard of the unimpeached testimony presented both by the taxpayer and the Commissioner. The minority opinion we regard as correct and unanswerable. As factfinders the minority judges ordinarily would be controlled by the majority, and this reviewing court need not regard their views; but here they say there is no substantial evidence to support the majority conclusion and that the evidence is all to the contrary, thus raising a question proper for our consideration.

The evidence consists of documents and the testimony of D. F. Howell presented by the taxpayer and of Harry W. Reinstein presented by the Commissioner. There is no contradiction or attempt at impeachment. The questions are as to the effect of the documents and whether they and the testimony are overridden by the circumstances.

In brief outline the facts are these. Howell Turpentine Company was incorporated in Florida in 1926 with a capital of $100,000 and thereafter conducted on pine lands which it owned the business of making turpentine and rosin at a distillery in Baker County and another in Union County. Besides the 5000 acres thus used the Company acquired about 45,500 acres of cutover lands which were unproductive, but on which it was conducting reforestation by the process of nature and by artificial planting of trees. The Company was not making money and in 1937, in 1939, and in 1940 it granted successively options to different prospective buyers for the purchase of all its lands, at a reduced price each year. The last option was to Rayonier, Inc., and it expired Aug. 9, 1940. No document and no testimony purports to show any effort thereafter on the part of the Company to sell.

D. F. Howell, who had been president of the Company from the beginning and who owned 85 per cent of its stock, his

two sons each owning 5 per cent and a former employee, Long, owning 5 per cent, testifies that shortly after August 9, 1940, he conferred with his sons, the three being the directors, and reached a decision not to permit the corporation again to try to sell the lands, but to liquidate it. Thereafter on August 25, Howell, having approached National Turpentine and Pulpwood Corporation offering to sell the land at a price lower than any before offered, met its president and its attorney Reinstein with his own attorney Milam, and an agreement was reached, and Reinstein was asked to draw the papers, Milam cooperating. Both Howell and Reinstein testified positively that it was understood that the title was in Howell Turpentine Company but that a liquidation was in process, and the contract was to be made with the individual stockholders on the basis that the liquidation would be accomplished by the time fixed for the conveyance of title. Reinstein, the Commissioner's witness, was asked, "You had no negotiations with the corporation as such?" and he answered, "No, the understanding was that they wanted to sell as individuals and were liquidating the corporation, and the entire conferences were with that understanding, as stated in the contract." The contract, not executed till September 6, clearly and explicitly so states and is signed by the three Howells individually.

Pending the preparation of this contract, on Sept. 4, Howell sent a telegram and a letter[1] to a public accountant who acted as auditor for the Turpentine Company, stating that the buyer's president had assured Howell that he would buy all the stock of the Turpentine Company instead of the land if it would save Howell income taxes, and Howell wished the auditor to come down and assist him in working out a proper method of selling the stock. Nothing came of this however; the stock was not sold, the contract was made as first agreed on.

On Sept. 6 the younger Howells acquired from Long his 5 percent of the stock and had it transferred into their names. Howell testified that Long's stock

was pledged as collateral for its purchase price, and Long had previously said he would sell it for the debt, he having left the Company. On this date the three Howells, now owning all the stock, in formal stockholders meeting resolved that the Turpentine Company should dissolve and wind up its affairs and collect its assets and discharge its obligations and completely liquidate, and if the liquid assets should be insufficient to pay the mortgage on the physical properties, such property should be distributed subject to the mortgage, and that all assets be distributed in kind to the stockholders in full payment and exchange for their stock. Actual dissolution was directed to be withheld till distribution should be accomplished. Also on September 6, at a later hour, the three Howells met with Reinstein at his office and duly executed the written contract which on August 25 had been agreed on and directed to be prepared. Some special provisions of this contract will be adverted to later. It concluded with a provision that if the Howells were unable to convey fee simple title to 80 per cent of the lands, the contract should terminate. On October 3, 1940, the Commissioner was advised pursuant to Internal Revenue Code, § 148(d), 26 U.S.C.A. Int.Rev.Code § 148(d), of the proposed liquidation of the Turpentine Company and a copy of the stockholders' resolution was annexed.

Turpentine and Rosin Factors, Inc., of Jacksonville, which handled the products of the Turpentine Company and also acted as banker for it and D. F. Howell, held the mortgage on the lands, on which $249,745 was owing, but subject to a credit on account of $114,303, leaving a balance of $139,442. D. F. Howell owed the Turpentine Company a sum of $120,502. An additional sum of $27,056 interest was then supposed to be due but was held not to be owing in Howell v. Commissioner, 5 Cir., 162 F.2d 316. On December 26, 1940, he gave Factors, Inc., his personal note for $180,500 and was given credit for that amount. He thereupon gave the Turpentine Company a draft on Factors, Inc., for $170,198, which was indorsed over by Turpentine

---

[1] The letter is signed "Howell Turpentine Co., D. F. Howell." but throughout it says "I" and "me," and concludes, "I am yours truly." It is a personal letter.

Company to Factors, Inc. The mortgage and all other indebtedness of the Company was thereby discharged and was cancelled. Also on December 26, 1940, the Turpentine Company by formal corporate action conveyed to the three Howells in proportion to their respective stock holdings, 53,448 acres of land in Baker and Union Counties. By a separate conveyance and bill of sale it conveyed all the remaining assets to them. On the next day their stock certificates, which had been surrendered, were marked cancelled. On that day, too, the three Howells, joined by their respective wives, conveyed the 53,448 acres of land to the Pulpwood Corporation, which made payment according to its contract, the cash part of which payment was applied by D. F. Howell on his $180,500 note given to Factors, Inc. The following day, December 28, 1940, the Turpentine Company formally declared its affairs completely liquidated, and resolved that the corporation be dissolved, and the directors were instructed to do all things necessary to dissolve it and surrender the charter. The Secretary of State declared it dissolved October 14, 1941. The income tax return of the Turpentine Company did not report any gain to it from the sale of the land. The Howells reported capital gains on their stock arising from the dividend in liquidation. The Commissioner charged to the corporation a gain in the sale of $207,-261, and assessed additional taxes accordingly. The Tax Court sustained the assessment substantially.

We address ourselves first to some misconceptions of law.

■ 1. It was not necessary to a contract of sale by the Howells as stockholders that they should by a prior action have agreed to a dissolution of the corporation and thereby have become "equitable owners" of the lands. A stockholder as such has no title, legal or equitable, to the corporation's property. His interest in it is a pro rata part of the residuum on a liquidation, much like the interest of a partner in partnership property, which we discussed, citing the authorities, in Bahr v. Commissioner, 5 Cir., 119 F.2d 371. He can sell his interest by selling his stock, but he cannot effectively convey any par-

ticular property of the corporation prior to a liquidation.

But he may validly contract to sell it before any steps are taken towards liquidation, if he has a reasonable prospect of obtaining title to it within the time fixed by the contract for the conveyance. This is true of stockholders as it is of people in general who have a prospect of obtaining title and are willing to assume a personal liability if they should fail. "It is not unusual for persons to agree to convey by a certain time notwithstanding they have no title to the land at the time of the contract, and the validity of such agreements is upheld. In such cases the vendor assumes the risk of acquiring the title and making the conveyance, or responding in damages for the vendee's loss of his bargain. * * * Whenever one is so situated with reference to a tract of land that he can acquire the title thereto, either by the voluntary act of the parties holding the title, or by proceedings at law or in equity, he is in position to make a valid agreement for the sale thereof, without disclosing the nature of his title." 55 Am.Jur., Vendor and Purchaser, § 12. The dissenting judges in this case quote 66 C. J., p. 511, Sect. 40, "A contract of sale may be valid and enforceable if made in good faith by the vendor notwithstanding the subject matter is realty to which the vendor at the time of entering the contract has no title, or a less interest than he agrees to convey, at least where he is so situated as to be able to convey at the proper time." They cite, too, the language of the Tax Court in Williams v. Commissioner, 3 T. C. 1002, as to the very case of a stockholder who as an individual contracts to sell property he expects soon to acquire by the liquidation of his corporation. Here D F. Howell alone, as owner of 85 percent of the stock, could prevent the corporation from selling out its lands, and he could force its liquidation and acquire title.

■ The majority judges are further in error in supposing that because prior to September 6 Howell had not consulted long as a stockholder about a liquidation, but only his two sons, he was in no position as a stockholder, representing himself and his sons, to contract as he was proposing to

do. Under the Florida law, Florida Stats. of 1941, § 612.46, F.S.A., ten days notice to all stockholders and a two-thirds vote in stockholders meeting, or else a unanimous written consent, was necessary to an actual dissolution, but the notice of a meeting could easily be given to Long and the Howells' vote would carry the question over his objection. But Long in fact was glad to sell his stock for the payment of the debt to which it was pledged, and he did so. The Howells were always in position to acquire title to the land by a liquidation of the corporation, on providing in any way they chose for the payment of the corporation's creditors. They did not have to act for the corporation in offering to sell the land on August 25, or on September 6. All the documents state and all the testimony is that they did not, but acted in their own names and for themselves.

■ **2.** The confessed fact that the Howells knew there was a latent gain in the land, and that it would be more heavily taxed if realized by a sale by the corporation than if realized by them as stockholders after a liquidation in kind, is of no legal significance. From the beginning of federal income taxation it has been established that taxable income in respect to such a gain does not exist until there is a realization of it by a conversion of the property. The government has no right to tax it till it is realized. No gain in the value of its lands is taxable to a corporation unless realized by a sale by it while it owns the land. By settled law a distribution of its property in kind without sale as a liquidating dividend is not taxed as a realization of gain by the corporation, but is taxed to each shareholder when the value of what he receives exceeds his investment in his stock.

■ This corporation was not succeeding in its business. There was no legal obstacle to the stockholders deciding, formally or informally, to liquidate the corporation, provide for the payment of its debts, and take over its property in kind, instead of letting the corporation sell the land if it could, pay its debts from the proceeds and turn the balance over to them. The United States could not object to either course. The tax laws provided for taxing gains realized by either course, but left both open to the choice of the stockholders. That the choice was dictated by a purpose of tax saving is no objection to it. This was decided in respect to another form of federal taxation in United States v. Isham, 17 Wall. 496, 21 L.Ed. 728. In Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355, it was held, "The legal right of a taxpayer to decrease the amount of what would otherwise be his taxes, or altogether to avoid them, by means which the law permits, cannot be doubted." This general rule was admitted in Commissioner v. Tower, 327 U.S. 280, 288, 66 S.Ct. 532, 90 L.Ed. 670, 164 A.L.R. 1135. Here there was unquestionably a genuine and final liquidation of the corporation. The contract of sale was the personal contract of the stockholders reciting the impending liquidation, which had in fact been formally ordered before the contract was signed. There was no previous negotiation between the purchaser and the corporation. The uncontradicted testimony supports the writing. There was a clear choice made as to how the liquidation should be carried out, and the means chosen were lawful.

■ **3.** The majority opinion makes much of the fact that D. F. Howell between August 25 and September 6 became impressed that a sale of all the stock was a simpler and better way to sell the land than to liquidate the corporation, and wrote the auditor that the president of the purchaser had signified a willingness to proceed to buy the land that way. It seems to us, as it did to the dissenting judges, a mere irrelevancy. The idea was not carried out. The original plan of the stockholders selling as individuals was proceeded with. The suggested sale of the stock did not involve any participation by the corporation in the sale, and if carried out would have been the act of the stockholders alone. It did not tend to show that the corporation was selling the land.

■ **4.** The majority opinion next argues that because on Sept. 6 the corporation first met and resolved to liquidate and dissolve, the resolution adding, "and the corporation is hereby declared to be in liquidation"; and because the three Howells afterwards on the same day signed the

individual contract of sale they must have acted for the corporation, for being directors they could not dispose of the title for their own benefit; and, (after discussing cases), it was concluded that they were trustees in liquidation necessarily acting for the corporation. We are referred in argument to Treasury Regulations 103, Sec. 19.22(a) 21; "Gross income of Corporation in Liquidation: When a corporation is dissolved, its affairs are usually wound up by a receiver or trustees in dissolution. The corporate existence is continued for the purpose of liquidating the assets and paying the debts and such receiver or trustees stand in the stead of the corporation for such purposes. Any sales of property by them are to be treated as if made by the corporation for the purpose of ascertaining gain or loss. No gain or loss is realized by a corporation from the mere distribution of its assets in kind in partial or complete liquidation, however they may have appreciated or depreciated in value since their acquisition." A distinction exists between the liquidation of a corporation and its dissolution. The officers may liquidate it, as they did here, prior to dissolution, which was not voted till Dec. 28, when everything had been done except the surrender of the charter. The Florida law, Florida Stats. of 1941, § 612.48, F.S.A., provides that after dissolution has been certified by the Secretary of State the directors become trustees for three years to represent the corporation in final adjustments. Until dissolution the officers and directors continue to act as such. The first three sentences of the above quoted Regulation apply by their terms to the situation after dissolution. They do not make the position of the Howells as directors and stockholders any different before December 28 from what they had always been. It is the last sentence of the Regulation that applies to this case, confirming what we said in paragraph 2 above, that no gain is realized by a corporation from the distribution of its assets in kind in liquidation, irrespective of their appreciation in value since their acquisition.

5. The further statement of the majority that "The government had a statutory right to tax based upon any sale by the corporation, and the trustees (the directors) could not merely by acting as stockholders evade their trust relationship to the detriment of a creditor for which they were trustee," merely begs the question. The government did not have any right to this tax unless the sale was made by the corporation. If it was not so made, the government had no right to the tax and was in no sense a creditor.

6. The majority also concluded that because the Howells' stock certificates were not cancelled till December 27, the conveyances of December 26 could not have been in liquidation and in exchange for the stock, since the consideration had not been paid. This we think is not the law. The stockholders had on September 6 all voted to receive the property in kind "in full payment and exchange for said stock; and that such distribution to stockholders be in complete cancellation and redemption of all its stock in accordance with this plan of liquidation." When on December 26 they accepted conveyances of all the assets in kind the stock was in law paid off and redeemed, and surrender and cancellation of the certificates could have been compelled. It does not appear when they were surrendered, but only that they were marked cancelled on December 27. It would not affect the transaction if they had never been so marked.

7. The final question is whether there is any evidence which consistently with law can be taken to prove that the corporation and not the stockholders made this sale. The written contract is plainly one by the stockholders as individuals. All the corporate minutes show that the corporation was liquidating by a distribution of its property to the stockholders in kind. The deeds are to them as tenants in common in proportion to their stock holdings. The stockholders made title the next day to the purchaser who had dealt only with them as individuals. That this mode of lawful dealing knowingly saved taxes is not an argument that it was not so done, but a powerful argument that it was. That the cash proceeds from the sale went to repay the money which D. F. Howell had advanced the previous day to pay off the corporate debts was only right. The stockholders

could arrange among themselves in any way they chose to raise the money necessary to free the assets. The fact that in the written contract the Howells reserved from the sale a few acres, their old home place; that D. F. Howell still had some faith in the turpentine business and contracted for a turpentine lease on some of the land sold; and the right to cut crossties at 25 cts. each as before; and by some arrangement with his sons apparently kept some of the residential property not deeded to the Pulpwood Corporation; is no evidence that the Turpentine Company and not the Howells sold the land to that Corporation. On the contrary, these personal matters would have had no proper place in a sale by the Company. No issue was made and no testimony was taken as to the disposition the Howells made among themselves of the property they did not sell. The only plausible ground put forward for inferring the sale to have been made by the Company is that the property was owned by it and that D. F. Howell was its president and could appropriately have negotiated for the Company prior to Sept. 6. But it is equally true that he was the controlling stockholder and could as appropriately have negotiated for himself and did not have to own the land, under the circumstances, to do so. He testifies squarely that he negotiated only for himself and the other stockholders. Long had given him no direct authority, but Long promptly sold them his stock. If he had not sold it and had insisted on getting and retaining his pro rata of the land, the contract would not have been affected; since by a provision of the contract it stood if title to 80 percent of the land should be delivered, and Long could have claimed only 5 percent of it.

The only judge who saw and heard Howell testify is the writer of the dissenting opinion. But if we say Howell need not be believed because of his financial interest in the case, there is Reinstein who represented the Pulpwood Corporation in the negotiation and has no interest and is put forward by the Commissioner as a credible witness. He testifies positively that the negotiation was not with the Turpentine Company, but with the stockholders as prospective owners by liquidation understood to be then in progress, and that he drew the written contract accordingly. There is neither testimony nor circumstance inconsistent with this testimony of this witness who knows what happened. Inferences which might have been made if he had not testified may not lawfully be made to the contrary by fact-finders, whether jurors or judges or board members. In Southern R. Co. v. Walters, 284 U.S. 190, 52 S.Ct. 58, 76 L.Ed. 239, the sole issue was whether a train stopped and flagged at a crossing as required by ordinance. There was evidence as to speed at nearby crossings, and opinions as to the time required to get up such speed after a full stop, from which it could be inferred there was no full stop; but there were unimpeached witnesses at the particular crossing who testified positively that the train did stop and flag, and the Supreme Court reversed a verdict based on the contrary inference as unauthorized. In Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 341, 53 S.Ct. 391, 394, 77 L.Ed. 819, the principle was elaborated thus: "The desired inference is precluded for the further reason that respondent's right of recovery depends upon the existence of a particular fact which must be inferred from proven facts, and this is not permissible in the face of the positive and otherwise uncontradicted testimony of unimpeached witnesses consistent with the facts actually proved, from which testimony it affirmatively appears that the fact sought to be inferred did not exist. This conclusion results from a consideration of many decisions, of which the following are examples." [2] The direction of a verdict was affirmed.

We do not discuss the many cases, more or less like this, from this and other inferior

---

[2] Among the cases cited in Frazier v. Georgia Railroad & Banking Co., 108 Ga. 807, 33 S.E. 996, of regretful interest to the writer, for it marks the burial of his first big damage suit. He had persuaded two juries that the conductor, believing him to be a trespasser, had forced a small boy from the platform of a rapidly moving train to his death; but the trial judge and appellate court held the conductor's testimony that he was trying to get the boy into the coach must be accepted.

courts. The one from the Supreme Court most relied on in argument by the Commissioner is Commissioner v. Court Holding Company, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981. The facts broadly distinguishing that case from this are quoted from 324 U.S. at page 333, 65 S.Ct. at page 708, 89 L.Ed. 981. "Between October 1, 1937, and February, 1940, while the corporation still had legal title to the property, negotiations for its sale took place. These negotiations were between the corporation and the lessees of the property * * * An oral agreement was reached as to the terms and conditions of sale, and on Feb. 22, 1940, the parties met·to reduce the agreement to writing. The purchaser was then advised by the corporation's attorney that the ·sale could not be consummated," for tax reasons. The next day the corporation declared a liquidating dividend which passed the property to the two stockholders, who then made a sale substantially the same as previously agreed on. It was held that the corporation could be found not to have abandoned its sale, but to have disguised it and carried it out. In the present case the corporation was never negotiated with, never agreed on any sale, and never carried out any. The sworn testimony precludes by a principle of law the inference to the contrary which the majority sought to draw. That inference we believe would not have been made at all but for the misconceptions of law to which we have adverted. Esteeming the judgment to be not in accordance with law we set it aside, and direct such further proceedings in accordance with this opinion as may be proper to redetermine the taxes involved.

Reversed.

HUTCHESON, Circuit Judge (concurring).

I agree with the result reached and with what it said in the majority opinion. I particularly agree with the view of the opinion that the fact that five members of the Tax Court, including the member who heard the evidence, disagree with the conclusions of the others should deprive the findings and opinion of the majority of the weight ordinarily attached on the theory of "expertise" to administrative findings. It is true that because of the majority, the Tax Court's judgment must follow the majority opinion, but I think it equally true that when the determination comes here for review, the weight it carries depends more upon the reasons given for arriving at it than upon the fact that it was made.

In cases of this kind, the controlling fact is not, as the majority of the Tax Court seem to think, that a sale by stockholders instead of by the company will effect a reduction in taxes. Where the facts are in dispute as to who made the sale, the tax consequences may be looked to for its evidentiary bearing. In cases like this one, where there is no question as to who made the sale, the matter of tax consequences is wholly immaterial. The determining question here, where on its face the contract of sale is one between the stockholders and the purchaser, is "Was the agreement of the stockholders as sellers really their agreement, or was it the agreement of the corporation as seller acting through the stockholders as its agents?" When, as here, the record is devoid of any fact from which it could be inferred that the corporation was the seller, to hold that it was is not a finding of fact but mere fiating. The evidence conclusively establishes that the stockholders who made the contract were dealing for themselves and not for the corporation. Indeed, the record contains no fact from which, according to the rules of right reason, it could be inferred that the corporation was making the sale through the stockholders as its agents. The Tax Court is authorized to determine the facts as the record presents them and draw reasonable inferences from the facts so determined. It is without authority to make findings contrary to those which are disclosed by the record. It cannot draw inferences the contrary of those which the record compels.

LEE, Circuit Judge (concurring).

I concur in Judge Sibley's opinion. To reach a contrary conclusion the court would have to hold that title in the corporation is of itself alone sufficient to warrant a finding that negotiations by and ·on behalf of the stockholders looking to a sale of properties passing to them in liquidation is for tax purposes a corporate sale.