**Harry H. HINES, Jr., Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 72-2731.

United States Court of Appeals, Fifth Circuit.

May 2, 1973.

**1064**

James P. Knight, Jr., Thomas A. Bell, Jackson, Miss., for plaintiff-appellant.

Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Atty., Jane Edmisten, App. Div. Tax Div., Dept. of Justice, Washington, D. C., H. M. Ray, U. S. Atty., Oxford, Miss., Jack D. Warren, Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before RIVES, GOLDBERG and MORGAN, Circuit Judges.

GOLDBERG, Circuit Judge:

This is an appeal from the denial of a claim by taxpayer, Harry H. Hines, Jr., for a recovery of income taxes and interest assessed and paid for the years 1966 and 1967. Although this appeal involves only taxpayer's personal income tax liability, the controlling question is one of corporate taxation: Whether the proceeds from the sale of property that had been distributed to taxpayer by a family-owned corporation were properly imputed to the distributing corporation when that corporation (1) did not negotiate the sale prior to the distribution and (2) did not participate in the sale after the distribution. We hold that the Commissioner and the District Court improperly imputed the proceeds to the corporation and we reverse the District Court's denial of taxpayer's claim.

## I. THE FACTUAL SETTING

The District Court's Memorandum Decision, reported at 344 F.Supp. 1259, lucidly summarizes both the factual context and the legal issue involved in this case. Accordingly, we set forth only those facts essential to an understanding of our disposition of this appeal.

Taxpayer was a director and secretary of Peeler Realty Company, Inc., a Mississippi corporation having its principal place of business in Kosciusko, Attala County, Mississippi. [Hereinafter "Peeler Realty"]. Peeler Realty is a family-owned corporation, incorporated in 1950 by taxpayer, taxpayer's grandmother, Mrs. Ethel Peeler, and taxpayer's grandfather, S. J. Peeler, a successful businessman who for many years operated a large lumber business in Kosciusko. In the course of conducting that business, S. J. Peeler acquired a large amount of cutover timberland located in Attala and adjoining counties in Mississippi, most of which he obtained at tax sales in the late 1930's for amounts ranging from fifty to seventy-five cents per acre.

At the first meeting of the incorporators and subscribers of Peeler Realty, on November 6, 1950, S. J. Peeler transferred some 27,500 acres of timberland and numerous low-cost rental houses situated in Kosciusko to Peeler Realty for 3,998 shares of the corporation's 4000

shares of authorized capital stock. Immediately thereafter, he began transferring his shares to his wife, children, and grandchildren by way of gifts. By August 25, 1965, shortly before the period here in issue, he had divested himself of all of his stock interest in the corporation.[1]

The business operations of Peeler Realty consisted almost entirely of holding the timberland conveyed to it by S. J. Peeler and renting out the low-cost houses. Although the corporation would occasionally sell small tracts of land or easements over the land and would sometimes market small quantities of timber, the corporate income was derived primarily from rents collected on the low-cost houses. Between 1954 and 1967, the corporation showed a profit in only four years; the losses during the other years were attributed primarily to the fact that the rental income was insufficient to pay the annual operating expenses and the *ad valorem* taxes on the timberland. The corporation's surplus account showed a deficit balance of $45,950.97 on October 31, 1966, the end of its fiscal year, and the deficit increased to $46,334.21 on October 31, 1967.

In the mid 1960's, the pulpwood industry in Attala County began to grow. The Georgia-Pacific Corporation had already purchased timberlands in the area and was eager to purchase other timberland to support its Mississippi mill operations. Moreover, during this period, the International Paper Company and the St. Regis Paper Company each built a pulpwood mill in Mississippi.

In November, 1964, following a "timber cruise," [2] the Georgia-Pacific Corporation made a written offer to pay a cash price of $57 per acre for Peeler Realty's timberland. As an alternative inducement—designed to accommodate Peeler Realty's desire to reduce the tax incidence of a sale of its timberland—Georgia-Pacific Corporation offered to pay a purchase price of $50 per acre in Georgia-Pacific stock, in the hopes of effecting a tax-free exchange. When these offers were rejected, Georgia-Pacific Corporation agreed to pay from $60 to $63 per acre for the timberland.

Some of the shareholders of the company were eager to sell the land to obtain cash, which they needed for various personal reasons. A minority of the shareholders, representing 930 shares, did not wish to sell. Taxpayer was willing to sell for the right price, but he did not think the Georgia-Pacific offer was sufficient.

Other large paper mills and lumber dealers were also interested in acquiring Peeler Realty's timberland. In the latter part of 1965, taxpayer discussed a possible sale with International Paper Company, Weyerhaeuser Company, St. Regis Paper Company, and Attala Lumber Company. International Paper Company and St. Regis Paper Company made "cruises" of the timberlands after the corporation indicated it was interested in selling the land. Peeler Realty did not, however, enter into any solid negotiations with either of these firms.

Eventually, it was decided that the one firm offer from Georgia-Pacific was not acceptable because it was not high

1. S. J. Peeler's stock interest was ultimately divided among the members of his family as follows:

| | |
|---|---|
| Mrs. Ethel Peeler (wife of S. J. Peeler) | 1,000 shares |
| Mrs. Lacy (daughter of S. J. Peeler) | 750 shares |
| Mr. Hines (taxpayer, son of Mrs. Lacy) | 250 shares |
| Mrs. Seay (daughter of S. J. Peeler) and her children | 750 shares |
| Mrs. H. Elmo Peeler (widow of S. J. Peeler's son) and her children | 1,000 shares |

2. A "timber cruise" is evidently a survey of timberlands to determine their economic potential.

enough. On December 27, 1965, the shareholders and directors of Peeler Realty conducted a meeting to discuss the corporation's financial condition. At this meeting, Robert W. Hartford (a lawyer and certified public accountant who had served S. J. Peeler for years and who had been elected chairman of the board of Peeler Realty on August 27, 1965) outlined the financial condition of the corporation and set forth the alternative courses of action available. Mr. Hartford advised the meeting that if things continued as they were going, the corporation would soon be bankrupt. He discussed the pros and cons of liquidation and of separating the heavily-taxed land from the corporation.

The majority of the shareholders wanted to sell the timberlands, and taxpayer, who was the informal spokesman for most of the shareholders, was fully aware of the tax consequences that would follow if the sale were made by the corporation. The tax basis of the property was quite low, not exceeding $40,000, and the selling price clearly would be in excess of the 1.5 million dollars which had already been offered by Georgia-Pacific and rejected as insufficient. Furthermore, taxpayer and Hartford were aware that a corporate sale would result in the payment of a capital gains tax by the corporation followed by the imposition of an additional tax on the individual shareholders after distribution. Liquidation and dissolution, a method provided by the Internal Revenue Code to avoid double taxation,[3] was not thought feasible because the corporation could not be terminated because S. J. Peeler's will left certain real property to the corporation and he had become mentally incompetent to change his will.

On January 18, 1966, the directors held a special meeting and decided to recommend to the shareholders that the corporation's timberland be distributed to the shareholders as tenants in common, with the interest of each to be determined by his or her pro rata interest in the corporate stock. The shareholders authorized the withdrawal and a law firm was engaged to prepare the conveyance, prior to which it was necessary to do substantial searching of the land records of the counties in which the land was located. The deed was executed by the directors on March 30, 1966, divesting Peeler Realty of title to the timberlands and leaving as its only asset the low-cost houses producing rental income. Once the deed was executed and recorded, the attorneys were authorized to make a title search of each tract and perform any work determined to be necessary in order to cure defects in the title and make the lands marketable.

The shareholders also executed a power of attorney giving taxpayer, Hartford, and Mrs. Ethel Peeler authority to handle the land and to sell it if they decided that a sale should be made. The power invested in the attorneys-in-fact by the document was very extensive, granting them an almost unlimited power to dispose of the property.

In October of 1966, as soon as the attorneys had completed their title search and the attorneys-in-fact had received assurances of the availability of title insurance, the attorneys-in-fact sent "Sales Guidelines" to International Paper Company, Georgia-Pacific Corporation, St. Regis Paper Company, and Attala Lumber Company, inviting them to submit sealed bids for the purchase of the land. The "Sales Guidelines" contained the conditions and terms of the sale and the method and manner of bidding on the land. The bids were opened in the office of Peeler Realty on November 14, 1966, and on December 15, 1966, International Paper Company's bid was accepted and the land was sold and conveyed to it on December 15, 1966 for $2,533,580.50.

The money received from the sale of the timberlands,[4] less expenses of the

---

3. *See* 26 U.S.C. § 331 et seq.

4. Prior to the sale of the timberlands to International Paper Company, the attor-

sale amounting to $99,831.27, was paid to the tenants in common, the shareholders of Peeler Realty. Taxpayer reported his pro rata portion of the proceeds from the sale of his interest in the timberland and claimed long-term capital gains status. Peeler Realty did not report the proceeds of the sale by its shareholders on its corporate income tax, nor did it treat them as additions to its earned surplus on the corporation's books.

## II. ACTION BY THE I.R.S. AND THE COURT BELOW

The Commissioner concluded that the gain on the sales of the land should be imputed to Peeler Realty because the distribution lacked a normal and justifiable commercial motivation and was made for the principal purpose of avoiding tax. By imputing the proceeds of the sales to the corporation, the Commissioner determined that Peeler Realty had current earnings and profits out of which to pay a dividend, see 26 U.S.C. § 316, and that therefore the distribution to the shareholders constituted a regular dividend to the extent of the current earnings and profits and the balance constituted a return of capital to the extent of the shareholder's basis .in the Peeler Realty stock, with any excess being eligible for capital gains treatment. See 26 U.S.C. § 301.

A deficiency of $7,900.24 in federal income taxes was then assessed against taxpayer, which he paid. After filing for refund without success, he instituted this suit in the District Court. Relying on United States v. Cumberland Pub. Serv. Co., 1950, 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251, and on Sections 336 and 346 of the Internal Revenue Code, taxpayer argued that the gain from the sale of the property was improperly imputed to Peeler Realty because (1) Peeler Realty had not negotiated the sale of the timberlands and (2) because the distribution of the timberland was a liqui-

dating dividend under Section 346. The government responded that the proceeds from the sale of property distributed by a going concern in anticipation of a sale by the shareholders and with no valid business purpose other than tax avoidance are properly imputed to the distributing corporation. The principal authorities relied on by the Commissioner were Commissioner v. Court Holding Co., 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; Commissioner v. Transport Trad. & Term. Corp., 2 Cir. 1949, 176 F.2d 570; and United States v. Lynch, 9 Cir. 1951, 192 F.2d 718.

The District Court found that: (1) Peeler Realty had not negotiated the sale of its timberland to anyone prior to transferring it to the shareholders and after the transfer, the stockholders were not obligated to sell the land to any particular purchaser and in fact they arranged their own sale with no participation by the corporation; (2) the distribution was not a liquidating distribution under ˢSection 336 or Section 346 of the Internal Revenue Code; and (3) the primary or principal purpose for the distribution of the land was to avoid the double tax that would have arisen had the corporation sold the land and then distributed the proceeds. The District Court realized that the factual situation in the case at hand differed from that in the cases relied upon by the government in that in all of those cases the corporation to which income was attributed had participated in the sale transaction from which the income arose. The Court reasoned, however, that those cases nevertheless justified an imputation of the income from the sale of the timberlands to Peeler Realty, and an order was entered denying taxpayer's claim for a refund.

## III. THE APPLICABLE LAW

■ The controlling question on this appeal is whether the gains from the sale of the timberlands could properly be imputed to Peeler Realty when the Dis-

neys-in-fact sold a small tract of the land for the sum of $8,000, which was

included in the total proceeds distributed among the shareholders.

trict Court explicitly found that Peeler Realty had not participated in the transaction in which the timberlands were sold. The starting point of our analysis is the Internal Revenue Code itself. Under Section 311 of the Code, as enacted at the time the transaction we here review, gain was ordinarily not realized by a corporation that distributed property to its shareholders.[5] Section 311 was not, however, intended to alter the law regarding the imputation of gain to a distributing corporation from a sale of distributed property by the corporation's shareholders when the corporation actually participates in the transaction in which the distributed property is sold.[6]

Our consideration of the propriety of applying the imputed income rule to Peeler Realty must begin with an analysis of Commissioner v. Court Holding Co., *supra,* the principal Supreme Court pronunciation in this area. In *Court Holding,* negotiations were entered into by a corporation with a particular purchaser for the sale by the corporation of its only asset, an apartment house. These negotiations culminated in an oral agreement by the corporation to sell the property. Subsequently, the corporation learned of the double tax that would arise if the corporation first sold the property and then distributed the proceeds of the sale to its stockholders. The corporation therefore refused to sell the property, and instead, distributed the property to its shareholders who in turn sold the property to the same purchaser with whom the corporation had negotiated on the same terms as the corporation had negotiated. The Tax Court found that the sale was really made by the corporation in performance of the prior agreement and attributed the gain to the corporation. The Fifth Circuit reversed, disagreeing with the Tax Court's fact-finding, but the Supreme Court reversed the Fifth Circuit, holding that the finding of the Tax Court that the sale was in reality made by the corporation must be accepted if supported by evidence. The Court stated:

> "Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress."

Commissioner v. Court Holding Co., *supra,* 324 U.S. at 334, 65 S.Ct. at 708, 89 L.Ed. 985 (footnotes omitted).

The Supreme Court's next consideration of the imputed income rule came in United States v. Cumberland

---

5. Section 311, as enacted at the time of this transaction, excluded three types of property from its nonrecognition treatment: Lifo inventoried goods, properties with liabilities in excess of basis, and certain installment obligations. In 1969, Section 311 was amended to also exclude certain distributions of property in redemption of stock from non-recognition treatment. Apparently Section 311 had been interpreted broadly up until the 1969 amendment, and Congress was attempting to narrow the scope of the non-recognition provision. The amendment, not applicable to the transaction *sub judice,* was enacted to prevent non-liquidating corporations from achieving corporate purposes by redeeming their stock with property whose value exceeded basis without having to recognize gain on the transaction. Thus it would seem that had Peeler Realty distributed its timberlands in redemption of stock in 1966, there would have been no recognition of gain to it, absent application of the imputed income doctrine. *See* S.Rep. No.91–552, 91st Cong., 1st Sess., 2 U. S.Code & Admin.News, pp. 2316–17 (1969) ; Conf.Rep.No.91–782, 91st Cong., 1st Sess., 2 U.S.Code Cong. & Admin. News, p. 2448 (1969).

6. *See* S.Rep.No.1622, 83d Cong., 2d Sess., 3 U.S.Code Cong. & Admin.News, pp. 4621, 4884 (1954) ; Comment, The Imputed Sale and Anticipatory Assignment of Income Doctrines: Their Effect on IRC §§ 311 & 316, 15 Buffalo L.Rev. 154 (1965).

Pub. Serv. Co., *supra*. In that case a corporation desired to go out of business, but its shareholders' offer to sell their stock to a competitor was rejected. The competitor countered with an offer to buy the corporation's equipment; however, the corporation turned down this offer in order to avoid paying a heavy capital gains tax. The shareholders of the corporation then offered to acquire the equipment from the corporation and sell it to the competitor themselves, thereby avoiding capital gains treatment for the corporation. That offer was accepted and the plan was consummated. The Commissioner attributed the gain from the sale to the corporation, but the Court of Claims refused to impute the gain, finding as a fact that the sale had been made by the shareholders, not the corporation. The court reasoned that the sale was made by the shareholders because although the transaction was for tax avoidance purposes, the corporation at no time intended to sell the equipment and the liquidation and dissolution genuinely ended the corporation's activities and existence. In affirming the Court of Claims, the Supreme Court placed great emphasis on the fact that the corporation had in fact been liquidated, but the Court also emphasized the importance of the ultimate finding of the lower court that the sale in question was made by the shareholders rather than by the corporation itself.[7]

A reading of *Court Holding* and *Cumberland* establishes that the proceeds of the sale of property distributed by a corporation to its shareholders should be imputed to the corporation only if the sale was in fact made by the corporation, not by the shareholders. In the instant case the District Court imputed to Peeler Realty the proceeds of a sale by its shareholders without finding that Peeler Realty had in fact made the sale. Moreover, the District Court found that Peeler Realty had neither negotiated the sale prior to distribution nor participated in the sale after distribution. The government argues that imputation was nonetheless proper because subsequent case law indicates that the imputed income rule must apply even where there are no pre-distribution sales negotiations, if the transfer was made (1) by an ongoing concern (2) in anticipation of a sale by the shareholders, and (3) with no valid business purpose aside from motives of tax avoidance. We cannot agree.

Our reading of the applicable case law in this area convinces us that the District Court erred. We hold that the *sine qua non* of the imputed income rule is a finding that the corporation actively participated in the transaction that produced the income to be imputed. Only if the corporation in fact participated in the sale transaction, by negotiation, prior agreement, postdistribution

7. The government distinguishes the case at hand from *Cumberland*, as well as from Commissioner v. Falcon Co., 5 Cir. 1942, 127 F.2d 277; Howell Turpentine Co. v. Commissioner, 5 Cir. 1947, 162 F.2d 319; Acampo Winery and Distilleries, Inc. v. Commissioner, 1946, 7 T.C. 629, and United States v. Cummins Distillers Corporation, 6 Cir. 1948, 166 F.2d 17, relied on by taxpayer, on the ground that all of those cases involved a liquidating corporation, while in the instant case the District Court found that Peeler Realty Company was not in either partial or full liquidation.

Taxpayer contends that Peeler Realty was in fact in partial liquidation as defined by Section 346(b) and would have been fully liquidated were it not for the fact that taxpayer's grandfather had become incompetent to change his will, which left property to the corporation. Of course, if Peeler Realty were in fact a liquidating corporation, this suit would not have been needed, since the Internal Revenue Code provides that ordinarily no gain should be recognized to a corporation on the distribution of property in partial or complete liquidation. *See* 26 U.S.C. § 336. However, the question of whether a corporate distribution is a liquidation is a question of fact, Cleveland v. Commissioner, 3 Cir. 1964, 335 F.2d 473; Fowler Hosiery Co. v. Commissioner, 7 Cir. 1962, 301 F.2d 394, and we are unable to say that the District Court's factual finding of no liquidation is clearly erroneous.

activities, or *participated* in any other significant manner, could the corporation be charged with earning the income sought to be taxed. Any other result would unfairly charge the corporation with tax liability for a transaction in which it had no involvement or control.

We are aided in reaching this conclusion by the Tax Court's reasoning in Waltham Netoco Theatres, Inc. v. Commissioner, 1968, 49 T.C. 399, aff'd, 1 Cir. 1968, 401 F.2d 333. In *Waltham,* after finding that a corporation had negotiated a sale prior to distributing property to its shareholders, the Tax Court imputed the proceeds of a sale by the corporation's shareholders to the distributing corporation. The court specifically rejected the government's argument, raised again in the case before us, that "the protection of Cumberland may not be available to nonliquidating distributions in kind by an ongoing corporation and that the corporation may be held taxable simply on the ground that there was a tax motivated preconceived plan." *Id.,* 49 T.C. at 405.

In *Waltham,* the government had relied on United States v. Lynch, 9 Cir. 1951, 192 F.2d 718; Commissioner v. Transport Trad. & Term. Corp., 2 Cir. 1949, 176 F.2d 570, and A. B. C. D. Lands, Inc. v. Commissioner, 1964, 41 T.C. 840, as it does here, but the Tax Court noted that

> "[p]articularly since the actual facts of the above cited cases do not require the more general rationale found in the opinions, we see no point in exploring such wider horizons until we are compelled to do so."

Waltham Netoco Theatres, Inc. v. Commissioner, *supra,* 49 T.C. at 406. In affirming *Waltham,* the First Circuit accepted the rationale of the Tax Court

and noted that non-imputation under *Cumberland* would be available to the nonliquidating corporation only "if the sale were the result of independent and active negotiations by its stockholders with [the purchaser] . . . ." Waltham Netoco Theatres, Inc. v. Commissioner, 1 Cir. 1968, 401 F.2d 333, 335. *See also* Ripy Bros. Distillers, Inc. v. Commissioner, 1948, 11 T.C. 326.

The cases relied on by the government also support the position we reach. In each of these cases, which we list in the margin,[8] the court specifically found that the taxpayer to whom income was imputed had participated in the sale made by other parties either through prior negotiations, prior agreements, or post-distribution assistance in the sale. Although there is *dicta* in Commissioner v. Transport Trad. & Term. Corp., *supra,* that indicates the Second Circuit *might* accept the government's argument, that case itself does not support imputation in the case at hand because its holding was based upon a finding that the sale from which income was imputed had already been negotiated by a controlling parent corporation prior to distribution by the taxpayer and that the subsequent sale was but a step in a sales transaction that had been finalized prior to distribution. Similarly, United States v. Lynch, *supra,* contains language that the Ninth Circuit was influenced by the government's imputation theory, but we read the court's holding in that case as being based primarily on the fact that the selling shareholders utilized the distributing corporation's sales facilities and received favored treatment from the distributing corporation. We therefore conclude that *Lynch* is not compelling authority for imputing income to Peeler Realty, for the District Court found that Peeler Realty did not

---

8. General Guaranty Mortgage Co. v. Tomlinson, 5 Cir. 1954, 335 F.2d 518; Commissioner v. Transport Trad. & Term. Corp., *supra*; United States v. Lynch, *supra*; Blueberry Land Co. v. Commissioner, 5 Cir. 1966, 361 F.2d 93; Meurer Steel Barrel Co. v. Commissioner, 3 Cir. 1944, 144 F.2d 282; Snively v. Commissioner, 5 Cir. 1955, 219 F.2d 266; Wichita Term. El. Co. v. Commissioner, 10 Cir. 1947, 162 F.2d 513; A.B.C.D. Lands, Inc. v. Commissioner, *supra*; Waltham Netoco Theatres, Inc. v. Commissioner, *supra.*

participate in the sale by its shareholders either before or after the distribution.

Only A. B. C. D. Lands, Inc. v. Commissioner, supra,[9] actually supports the government's position, for the Tax Court in that case held that regardless of corporate participation it would impute income to a distributing corporation because the distribution was made by an ongoing corporation for tax avoidance purposes with an expectation of immediate sale by the shareholders. Although we agree with the result reached in that case, we do so only because there were ample factual findings by the Tax Court to support a finding that the sale was in fact participated in by the distributing corporation, and we expressly disavow the imputation theory espoused in that case.

Although there does appear to be a monumental loophole in Section 301 of the Internal Revenue Code, which allows deficit corporations to distribute appreciated property without having the distribution taxed as ordinary income to the distributee, we do not think it proper to attempt to plug that loophole by conjuring up visions of corporate sales where no corporate activities justify such images. The tax loophole in this situation is not based upon imputation · or non-imputation of corporate sales, but the aperture exists because distributions of appreciated property by a deficit corporation are not deemed distributions in the nature of dividends. We are not nearly so certain as the Internal Revenue Service, which administers the Code, that absent imputation the passage is marked "no trespassing" into the domains of ordinary income taxation under the facts of this case, but the government takes a different position.[10] Under the law and regulation, who are we to say nay, though as pathfinders we may have reached a different result.

*Court Holding* has not been judicially elasticized to the degree that the government argues and its tentacles have to a large extent been amputated. Moreover, we do not believe that it is our function to play loop the loop for the government because of some result oriented tax theory. In light of the fact that Peeler Realty had never actively negotiated with International Paper Company, the ultimate purchaser, and in light of the fact that the sale of the timberlands was conducted by competitive bidding, without Peeler Realty negotiating with the final purchaser, we do not find the District Court's fact finding that Peeler Realty did not participate in the sale of the timberlands clearly erroneous.[11] We

---

9. A.B.C.D. Lands, Inc. v. Commissioner is persuasively criticized in Comment, The Imputed Sale and Anticipatory Assignment of Income Doctrines: Their Effect on IRC §§ 311 & 336, 15 Buffalo L.Rev. 154 (1965).

10. At oral argument we requested the parties to brief the question of how the taxpayer should be taxed if the Court did not impute the proceeds from the sale of the property back to the corporation, and if it did not treat the distribution as one in partial liquidation. The government responded that absent imputation, taxpayer was entitled to capital gains treatment on the appreciated property received from Peeler Realty because "[u]nder the applicable statutory scheme, the existence of earnings and profits is a prerequisite to a determination that a corporate distribution is taxable." Therefore, since the government conceded that the timberlands were not inventory under Section

312(b) of the Code, earned surplus could only be derived by application of the imputed income rule. See 26 U.S.C. §§ 301 and 316.

11. The application of the imputed income rule depends upon the factual findings of the District Court, which must be accepted unless clearly erroneous. Cf. Commissioner v. Court Holding Co., supra; United States v. Cumberland Pub. Serv. Co., supra; Salvatore v. Commissioner, 2 Cir. 1970, 434 F.2d 600. In the case before us, the District Court did not find that Peeler Realty made the sale of the timberlands, nor did it find that Peeler participated in the sale. Because the District Court did not make these findings, and because it found, in fact, that Peeler Realty did not participate in the sale of the timberlands, we hold that as a matter of law the District Court's application of the imputed income rule was error.

therefore hold that it was error to impute the proceeds of the sale of the timberlands to Peeler Realty and that the District Court's denial of taxpayer's claim for a refund must be reversed, for, absent imputation, Peeler Realty had no earned surplus from which an ordinary income-producing dividend could be paid.

▮ Certainly, the fact finding of a legally auspicated tax avoidance motive does not inject taxability into the transaction. Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; Blueberry Land Co. v. Commissioner, 5 Cir. 1966, 361 F.2d 93; Howell Turpentine Co. v. Commissioner, 5 Cir. 1947, 162 F.2d 319. Furthermore, we do not think that this taxpayer has been treated to a windfall. Taxpayer would not have been taxed at ordinary income rates had Peeler Realty liquidated, and although Peeler Realty did not in fact liquidate, it came close to liquidating, retaining only passive income-producing property, and it would have liquidated entirely had it not been for the unfortunate circumstance of S. J. Peeler's irrevocable will.[12] In a circumstance such as this, where the Code would not tax a liquidating corporation even if the corporation negotiated the sale, we do not think that the Code or the case law justifies imputing taxable income to a corporation that did not participate in the sale of the distributed property and that was only prevented from obtaining the safe harbor of liquidation by the quirk of an irrevocable bequest.

## IV. CONCLUSION

Our diagnosis of the transactions here clinically examined convinces us that Peeler Realty was not infected with Court Holding's selling virus. Though we detect symptoms of imputation, we must have a proven pathology and not merely a visceral reaction before we can find that taxpayer's receipts are attributable to Peeler Realty without significant corporate selling kinetics. The wailing cry of the government is that the distribution of Peeler Realty's timberland does not receive ordinary income taxation absent imputation, and so it will bemoan our holding that imputation is impossible absent a finding that the corporation effectuated or participated in the sale of the timberlands. We feel, however, that the government's lachrymosity and lamentations should arise from the fact that Congress has deemed that the distribution of appreciated property by a deficit corporation does not of itself produce ordinary income for the recipient shareholder. This Court will not make sellers out of non-sellers when the government coffers should be enriched, if at all, by making recipients of appreciated assets ordinary-income taxpayers. It is for Congress to make that decision, and until it does we read Court Holding and its progeny as dealing with corporate activities and not with the problem of receipts by taxpayers in the nature of dividends. We therefore remit to the lawmakers the duty of codifying, for as the shoemaker sticks to his last, we must stick to our special role of interpreting the words of Congress. We hold that the District Court erred in imputing to Peeler Realty income arising from Peeler Realty's shareholders' sale of timberlands and that therefore taxpayer's claim for a refund should not have been denied.

Reversed.

---

12. See also note 5, supra.